**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| ABD AL HAKIM GHALIB AHMAD ALHAG, |
| Petitioner, |
| v. |
| GEORGE W. BUSH, <u>et al.</u>, |
| Respondents. |

Civil Action No. 05-2199 (HHK)

**RESPONDENTS' OPPOSITION TO PETITIONER'S
MOTION FOR PRELIMINARY INJUNCTION REQUIRING
<u>ADVANCE NOTICE OF TRANSFER OR RELEASE</u>**

Respondents respectfully submit this memorandum in opposition to petitioner's motion for a preliminary injunction requiring 30 days' advance notice to the Court and counsel of his transfer or release from Guantanamo (dkt. no. 2). Preliminarily, there is a potential practical problem with this case: respondents are not aware of any detainee at Guantanamo who goes by the name "Abd Al Hakim Ghalib Ahmad Alhag." This presents a significant problem because if this Court were to enter an order requiring advance notice of a transfer of petitioner, there would be no way of knowing which if any individual in respondents' custody was covered by that order. Respondents' counsel have contacted petitioner's counsel about this uncertainty, and understand that petitioner's counsel are in the process of gathering information in an effort to resolve it. If this issue is resolved and it becomes necessary for the Court to reach the merits of petitioner's motion, the motion should be denied because it fails to establish a factual or legal basis for the relief sought.[1]

---

[1] Similar motions have been filed over the past nine months in numerous other

(continued...)

## BACKGROUND

**A.    Detention of Enemy Combatants at Guantanamo**

Following the terrorist attacks of September 11, 2001, pursuant to his powers as

Commander in Chief and with congressional authorization, see Authorization for Use of Military

Force, Pub. L. No. 107-40, 115 Stat. 224 (2001), the President dispatched the United States

Armed Forces to seek out and subdue the al Qaeda terrorist network and the Taliban regime and

others that had supported it.  In the course of those hostilities, the United States has captured or

taken custody of a number of foreign nationals as enemy combatants, some of whom are being

held at the Guantanamo Bay Naval Base ("Guantanamo") in Cuba.

**B.    Repatriation and Transfer of Enemy Combatant Detainees at Guantanamo**

Although the laws of war permit the United States to hold enemy combatants in detention

for the duration of hostilities, the United States has no interest in detaining any individuals longer

than necessary.  See Declaration of Deputy Assistant Secretary of Defense for Detainee Affairs

Matthew C. Waxman dated June 2, 2005 ("Waxman Decl.") ¶ 3; Declaration of Ambassador

---

[1](...continued)
Guantanamo detainee habeas cases, with varying results.  Compare, e.g., El-Mashad v. Bush,
Civ. A. No. 05-270 (JR), Order dated April 7, 2005 ( prohibiting transfer or release as part of stay
of proceedings); Abdah v. Bush, Civ. A. No. 04-1254 (HHK), 2005 WL 711814 (D.D.C. Mar.
29, 2005) (granting preliminary injunction), with Kurnaz v. Bush, Civ. A. No. 04-1135 (ESH),
2005 WL 839542 (D.D.C. Apr. 12, 2005) (granting preliminary injunction only as to transfers
other than for release), with Al-Oshan v. Bush, Civ. A. No. 05-520 (RMU) (D.D.C. Mar. 31,
2005) (ordering advance notice as part of stay), with Deghayes v. Bush, Civ. A. No. 04-2215
(RMC) (D.D.C. June 15, 2005) (denying preliminary injunction but requiring notice to the Court
of any decision to transfer a particular individual to a particular country), with Almurbati v.
Bush, 366 F. Supp. 2d 72 (D.D.C. 2005) (denying preliminary injunction); Al-Anazi v. Bush,
370 F. Supp. 2d 188 (D.D.C. 2005) (same); Mammar v. Bush, Civ. A. No. 05-573 (RJL), slip op.
(D.D.C. May 2, 2005) (same); Attash v. Bush, Civ. A. No. 05-1592 (RCL), slip op. (D.D.C. Sept.
1, 2005) (same).  Respondents have taken interlocutory appeals of the orders requiring advance
notice.  No order denying advance notice has been appealed.

Pierre-Richard Prosper dated March 8, 2005 ("Prosper Decl.") ¶ 2.[2]  The Department of Defense ("DoD") conducts at least annual reviews of each Guantanamo detainee to determine whether continued detention is warranted based on factors such as whether the detainee continues to pose a threat to the United States and its allies.  Waxman Decl. ¶¶ 3, 7; Prosper Decl. ¶ 2.  Those annual reviews include those currently being conducted through Administrative Review Boards.  See Waxman Decl. ¶¶ 3, 7.[3]  As part of the Administrative Review Board process, counsel who represent detainees have been invited to make written submissions concerning whether further detention is appropriate; in these submissions, counsel are free to raise, and in fact have raised, any concerns about transfer or repatriation, and have in fact made such submissions.

Following consultation with various agencies, a senior Department of Defense official grants the ultimate approval for the transfer of any Guantanamo detainee to the control of another government.  Waxman Decl. ¶¶ 6-7; Prosper Decl. ¶¶ 2-3, 7.  Almost 250 Guantanamo detainees have been so transferred, over a period spanning several years.  Waxman Decl. ¶ 4; Prosper Decl.

---

[2] The June 2, 2005 Waxman Declaration submitted herewith replaces and supersedes two prior declarations by Deputy Assistant Secretary Waxman submitted in connection with similar motions in other Guantanamo detainee cases.  See Waxman Decl. ¶ 1.  The Prosper Declaration submitted herewith was originally submitted in connection with a similar motion in Abdah, Civ. A. No. 04-1254 (HHK), and Ambassador Prosper left office on or about October 11, 2005, but the policies and practices set forth in his March 8 declaration remain in effect and are applicable to the instant case.  Certain numerical information in the declarations is subject to updating.  See infra note 4.

[3] See generally Memorandum of the Deputy Secretary of Defense dated May 11, 2004, re: Administrative Review Procedures for Enemy Combatants in the Control of the Department of Defense at Guantanamo Bay Naval Base, Cuba, available at <<http://www.defenselink.mil/news/May2004/d20040518gtmoreview.pdf>>; Memorandum dated September 14, 2004, re: Implementation of Administrative Review Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba, available at <<http://www.defenselink.mil/news/Sep2004/ d20040914adminreview.pdf>>.

¶ 2.[4]

Where continued detention by the United States is not warranted, a detainee may be transferred to the control of another government, typically the government of his country of citizenship, for release. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3. The United States also transfers Guantanamo detainees, under appropriate circumstances, to the control of other governments for continued detention, investigation, and/or possible prosecution when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not pose a threat to the United States and its allies. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3. Such governments can include the government of a detainee's country of citizenship, or another country that may have law enforcement, prosecution, or other interest in the detainee. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.

Such transfers to the control of other governments for continued detention, investigation, and/or prosecution occur after a dialogue between the United States and the receiving government, which may have been initiated by either the United States or the receiving government. Waxman Decl. ¶ 5. The purpose of such dialogue is to ascertain or establish what measures the receiving government intends to take, pursuant to its own domestic laws and independent determinations, that will ensure that the detainee will not pose a continuing threat to the United States and its allies. Id. In all cases where a transfer is consummated, the detainee is transferred entirely to the custody and control of the other government; once transferred, the

---

[4] As an update to certain information provided in the attached declarations, at last count, 256 detainees have been transferred by the Defense Department from Guantanamo, of which 180 were transferred for release. See Department of Defense Press Release, "Detainee Transfer Announced," Nov. 5, 2005, available at <<http://www.defenselink.mil/releases/>>.

individual is no longer in the custody or control of the United States.  Id.  Any future detention of

that individual is by the foreign government pursuant to its own laws and not on behalf of the

United States.  Id.  In fact, most of the Guantanamo detainees who have been transferred by the

Department of Defense to the control of their home countries for continued detention,

investigation, and/or prosecution have been released from detention some time after the transfer.

Id.

In any transfer, a key concern is whether the foreign government will treat the detainee

humanely and in a manner consistent with its international obligations.  Prosper Decl. ¶ 4;

Waxman Decl. ¶ 6-7.  It is the policy of the United States not to repatriate or transfer a detainee

to a country where the United States believes it is more likely than not that the individual will be

tortured.  Prosper Decl. ¶ 4; Waxman Decl. ¶ 6.  If a transfer is deemed appropriate, a process is

undertaken, typically involving the Department of State, in which appropriate assurances

regarding the detainee's treatment are sought from the country to whom the transfer of the

detainee is proposed.  Waxman Decl. ¶ 6; Prosper Decl. ¶ 5.  Once the Department of Defense

approves a transfer and requests the assistance of the Department of State, the Department of

State initiates transfer discussions with the foreign government concerned.  Waxman Decl. ¶ 6;

Prosper Decl. ¶ 6.  Such discussions include an effort to seek assurances that the United States

Government considers necessary and appropriate for the country in question, including

assurances of humane treatment and treatment in accordance with the international obligations of

the foreign government accepting transfer.  Id.  Among other things, the Department of State

considers whether the nation in question is a party to relevant treaties such as the Convention

Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and pursues

more specific assurances if the nation concerned is not a party or other circumstances warrant.
Id.

The determination whether it is more likely than not an individual would be tortured by a receiving foreign government, including, where applicable, evaluation of foreign government assurances, involves senior level officials and takes into account a number of considerations, including whether the nation concerned is a party to certain treaties; the expressed commitments of officials of the foreign government accepting transfer; the particular circumstances of the transfer, the country, and the individual concerned; and any concerns regarding torture that may arise. Prosper Decl. ¶¶ 6-8; Waxman Decl. ¶ 7. Recommendations by the State Department are developed through a process involving the Bureau of Democracy, Human Rights, and Labor (which drafts the State Department's annual Country Reports on Human Rights Practices) and the relevant State Department regional bureau, country desk, or U.S. Embassy. Prosper Decl. ¶ 7. When evaluating the adequacy of assurances, State Department officials consider the identity, position, or other information concerning the official relaying the assurances; political or legal developments in the foreign country concerned that provide context for the assurances; and the foreign government's incentives and capacity to fulfill its assurances to the United States. Prosper Decl. ¶ 8. In an appropriate case, the State Department may consider various monitoring mechanisms for verifying that assurances are being honored. Id. If a case were to arise in which the assurances obtained from the receiving government were not sufficient when balanced against treatment concerns, the United States would not transfer a detainee to the control of that government unless the concerns were satisfactorily resolved. Waxman Decl. ¶ 7; Prosper Decl. ¶ 8. Indeed, circumstances have arisen in the past where the Department of Defense decided not

to transfer detainees to their country of origin because of mistreatment concerns. Waxman Decl. ¶ 7; Prosper Decl. ¶ 8.

The United States' ability to seek and obtain assurances from a foreign government depends on its ability to treat its dealings with the foreign government with discretion. Prosper Decl. ¶ 9; Waxman Decl. ¶ 8. Obviously, diplomatic sensitivities surround the Department of State's communications with foreign governments concerning allegations relating to torture. Prosper Decl. ¶ 9; Waxman Decl. ¶ 8. The United States Government typically does not unilaterally make public any specific assurances or other precautionary measures obtained, because such disclosure would have a chilling effect on and cause damage to our ability to conduct foreign relations. Prosper Decl. ¶ 9. If the United States Government were required to disclose its communications with a foreign government relating to particular mistreatment or torture concerns outside appropriate Executive Branch channels, that government and potentially other governments would likely be reluctant to communicate frankly with the United States concerning such issues in the future.[5] Prosper Decl. ¶¶ 9-10; Waxman Decl. ¶ 8. As a result, disclosure could impede our country's ability to obtain vital cooperation from concerned governments with respect to military, law enforcement, and intelligence efforts related to the war on terrorism. Waxman Decl. ¶ 8; Prosper Decl. ¶ 12.

---

[5] Another reason such disclosure would be harmful is that the State Department's recommendation concerning transfer relies heavily on facts and analyses provided by Embassies and other State Department offices, and confidentiality is necessary to ensure that the advice and analysis provided by those offices are useful and informative for the decision-maker. Prosper Decl. ¶ 11. Disclosure of their assessments could chill important sources of information and interfere with the ability of our foreign relations personnel to interact effectively with foreign state officials. Id.

## ARGUMENT

## I.    PRELIMINARY INJUNCTION STANDARD

It is well-established that a request for preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004).  To prevail in a request for a preliminary injunction, a movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.'" See Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)).

In particular, the irreparable harm that must be shown to justify a preliminary injunction "must be both certain and great; it must be actual and not theoretical." Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985).  "Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time; the party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." Id. (citations and internal quotation marks omitted; emphasis in original).[6]

---

[6] Some Judges of this Court have entered the functional equivalent of preliminary injunctive relief as a component of a stay of proceedings related appeals.  However, as one Judge of this Court has concluded, "if the petitioners cannot meet the prerequisites of a motion for preliminary injunction . . . it is unlikely that they should receive that same relief through the backdoor of a stay." Al-Anazi, 370 F. Supp. 2d at 199 n.11 (citing Laborers' Intern. Union of North Am. v. Nat'l Post Office Mail Handlers, 1988 WL 142384, at *1 (D.D.C. Dec. 23, 1988)).

(continued...)

8

**II.    PETITIONER FAILS TO SHOW IRREPARABLE INJURY**

**A.    The Mooting of a Habeas Claim that Naturally Flows From Relinquishment of United States Custody Does Not Constitute Irreparable Injury Justifying a Preliminary Injunction**

Some Judges of this Court have required advance notice of any transfer through a preliminary injunction or otherwise in order to "protect" or "preserve" the Court's jurisdiction, reasoning that a transfer would or could extinguish the transferred detainee's habeas claims and curtail the Court's review of the legality of his detention.  Respondents respectfully suggest that these decisions rest on faulty logic.  The ultimate relief sought by petitioner in this habeas case is obviously release from custody.  Any right to challenge the legality of one's detention through a habeas proceeding cannot reasonably extend so far as to require that detention be continued, after the Executive determines that the military rationales for enemy combatant detention no longer warrant such custody, for no reason other than to be able to test the legitimacy of detention the Executive no longer is interested in maintaining.[7]  "The ultimate objective of a habeas petition is

_____

[6](...continued)
Thus, in whatever form of order the inherently-injunctive-in-nature relief petitioner seeks might be embodied, petitioner should be required to satisfy the preliminary injunction standard in order to justify that relief.

[7] Transfers of Guantanamo detainees are not undertaken in order to thwart the jurisdiction of the Court.  Waxman Decl. ¶ 3.  Indeed, such transfers have been occurring since October 2002, long before the June 28, 2004 Rasul Supreme Court decision and the proliferation of detainee habeas petitions that it spawned in this Court.  Waxman Decl. ¶ 4.  It has been noted that 131 transfers (i.e., more than half of the transfers to date) had occurred three months or longer before Rasul was decided, "thus casting doubt on petitioners' suggestion that DOD is undertaking a policy of transfer in order to thwart the jurisdiction of the courts."  Al-Anazi, 370 F. Supp. 2d at 196 n.7 (citing Dep't of Defense, Transfer of Afghani and Pakistani Detainees Complete (Mar. 15, 2004), available at http://www.defenselink.mil/releases/2004/nr20040315-0462.htm); see also supra note 3 (citing documents showing that administrative review process for considering transfers and repatriations predates Rasul and the filing of this and most other
(continued...)

9

release from custody." Almurbati, 366 F. Supp. 2d at 78. As one Judge of this Court stated,

"once the respondents release the petitioners from United States custody . . . they will have

obtained the result requested and at that point there will be no further need for this Court to

maintain jurisdiction." Id. at 80; see also Al-Anazi, 370 F. Supp. 2d at 198 ("Every habeas

petition, including this one, is ultimately about obtaining release from detention, and where, as

here, the United States will relinquish custody of the detainee to the home government there is

nothing more the Court could provide to petitioners." (citation omitted)).

That release from United States custody will give petitioner all the relief he can seek

through habeas is not altered by the fact that, upon being released from the custody of the United

States, a former detainee may be taken into custody and detained in the receiving country based

on that country's independent interests and determinations. As respondents' declarations make

clear, when the Department of Defense transfers detainees to the control of other governments,

the detainees are no longer subject to the custody or control of the United States, and any

subsequent confinement in the receiving country is based on the receiving government's

independent decision, based on its domestic laws, that the individual should be detained.

Waxman Decl. ¶ 5. Indeed, even if the United States transfers a detainee to his home

government with the understanding that, from the United States' perspective, he can be released,

the home government may well subsequently take any law enforcement or investigatory action

against the former detainee that it may deem appropriate under its laws. The Court should

therefore reject petitioner's suggestion that the possibility of future detention in an individual's

---

[7](...continued)
detainee habeas petitions).

home or another country based on that country's independent interests and determinations

constitutes irreparable injury warranting an injunction.

> **B.      Speculation that the United States Will Defy its Own
> Policy by Transferring Detainees to Countries in
> Circumstances Where it is Believed They Will be Tortured
> Does Not Warrant a Preliminary Injunction**

Nor can petitioner carry his burden to show irreparable injury that is "certain and great . . .

actual and not theoretical," Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985), by

rife speculation that, contrary to the policies and processes attested to in the sworn declarations

of high-level Executive Branch officials, the United States has designs to send petitioner to a

foreign country in circumstances where he will be tortured.  Those declarations, after all, make

clear that it is the policy of the United States not to repatriate or transfer a detainee to a country

when the United States believes, based on a number of factors and considerations, it is more

likely than not that the individual will be tortured there.  Prosper Decl. ¶ 4; Waxman Decl. ¶ 6.

This policy is implemented through a process that contains several levels of precautions and

safeguards.  To conclude that an injunction is nevertheless necessary would require the Court to

assume, without any evidence, that the United States' policy and practice is somehow a sham or

pretext.  There is no valid basis for such an assumption.

Rather, as one Judge of this Court has found, respondents' sworn declarations "directly

refute the petitioners' allegations of their potential torture, mistreatment and indefinite detention

to which the United States will in some way be complicit."  Almurbati, 366 F. Supp. 2d at 78.

Moreover, another Judge found that the assortment of magazine and newspaper stories relied

upon by many detainee-petitioners in these cases – including petitioner here – failed to form a

factual predicate justifying an injunction, noting that, among other problems with relying on such materials, "[p]etitioners [in that case] concede that none of these incidents involve the transfer of detainees out of Guantanamo." Al-Anazi, 370 F. Supp. 2d at 190-91; see also id. at 196. Thus, petitioner has failed to show that either the prospect of relinquishment from United States custody or unfounded speculation about possible torture in a foreign country constitute irreparable harm that must be remedied by a preliminary injunction.

## III.    PETITIONER CANNOT SHOW A LIKELIHOOD OF SUCCESS IN OBTAINING A COURT ORDER PREVENTING A TRANSFER IN ACCORDANCE WITH THE POLICIES EXPRESSED IN RESPONDENTS' DECLARATIONS

Petitioner fares no better on the second prong of the preliminary injunction analysis, which requires him to show that he is likely to succeed, following notice, in preventing a transfer from Guantanamo.

To be clear, whatever the merits of the issues currently before the D.C. Circuit in the ongoing appeals in Khalid v. Bush, 355 F. Supp. 2d 311 (D.D.C. 2005), appeals docketed, Nos. 05-5062, 05-5063 (D.C. Cir. Mar. 2, 2005), and In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443 (D.D.C. 2005), appeal on petition for interlocutory appeal, No. 05-5064 et al. (D.C. Cir.), and of petitioner's claims that he is being wrongfully detained, it is not the likelihood of success on those issues or claims that matters for purposes of the instant motion for preliminary injunction. Rather, as two Judges of this Court (who reached opposite outcomes on the bottom line of whether to require advance notice) have agreed, the likelihood of success analysis must focus on the legal basis for petitioners to obtain an order preventing termination of detention by the United States in the manner described in the declarations submitted herewith. See Al-Anazi,

370 F. Supp. 2d at 194 ("[T]he presence of a sound basis to challenge the legality of one's underline detention does not at all imply that there exists a sound basis to challenge the legality of one's underline transfer.  Put differently, the 'merits,' if you will, to be assessed for purposes of the present claim for preliminary injunctive relief, is petitioners' challenge to their underline transfer from Guantanamo, not to their underline detention at Guantanamo (emphasis in original)); Abdah, 2005 WL 711814, at *4 ("if there are no circumstances under which Petitioners could obtain a court order preventing a contemplated transfer, a preliminary injunction should not be granted" (emphasis in original)).

Petitioner merely makes vague references to his belief that he is likely to prevail in the underlying case challenging his detention, and fails to identify any valid source of legal authority for an order prohibiting a transfer.  Moreover, even if such a source existed, the Rule of Non-Inquiry, which bars judicial inquiry into the fairness of a foreign nation's justice system and the procedures or treatment that an individual may experience in a foreign nation, weighs heavily against petitioner's likelihood of success in contesting a transfer or repatriation.

A.     **No Valid Legal Basis Exists for a Judicial Order Enjoining Transfer or Repatriation of an Individual Previously Detained by the United States as an Enemy Combatant**

As discussed above in the context of irreparable harm, see supra Section II.A, protection of the Court's jurisdiction would not be an appropriate legal rationale for an order forbidding transfer or repatriation of an individual detained at Guantanamo, because relinquishment from United States custody (which occurs in every such transfer or repatriation) represents the full extent of relief that petitioners could obtain in habeas.  See Almurbati, 366 F. Supp. 2d at 80 ("[O]nce the respondents release the petitioners from United States custody . . . they will have obtained the result requested and at that point there will be no further need for this Court to

13

maintain jurisdiction."); see also Al-Anazi, 370 F. Supp. 2d at 198.[8]  Indeed, it has been noted

that, "[w]ere the Court to preserve its jurisdiction over the habeas petitions, and ultimately

determine that the United States may no longer detain the petitioners, the parties and the Court

would find themselves in precisely the same position in which they find themselves now – with

the respondents taking steps to transfer those individuals out of United States control, and the

petitioners compelled to come forward with some legal or evidentiary basis to prevent transfer to

an 'undesirable' country." Al-Anazi, 370 F. Supp. 2d at 196.  Thus, petitioner does not enjoy a

likelihood of success in obtaining an order barring a transfer in order to "protect" the Court's

jurisdiction.[9]

 Some detainee-petitioners in these cases have claimed, although no Judges have adopted

as a basis for ordering relief, that any transfer or repatriation would violate certain international

treaties such as the Geneva Conventions.  These claims are not valid and do not provide a basis

---

 [8] One of the previous decisions on a similar motion in another Guantanamo detainee case criticized this proposition as "overly simplistic," because "[p]etitioner ultimately seeks total freedom from all custody, not just United States custody." Al-Marri v. Bush, Civ. A. No. 04-2035 (GK), 2005 WL 774847, at *3 n.7 (D.D.C. Apr. 4, 2005).  Whatever petitioner may ultimately seek, however, a court of the United States clearly does not have jurisdiction to award a foreign national the relief of "freedom from all custody" worldwide, in the sense of immunity from detention in his home or a third country pursuant to its own domestic laws and independent determinations.  It is beyond cavil that the courts of the United States would have no authority to interfere with any decision a foreign sovereign nation may make to detain, investigate, or prosecute its own nationals being returned to it.

 [9] Petitioner charges that to repatriate or otherwise transfer him would somehow "flout" Judge Green's ruling in In re Guantanamo Detainee Cases.  Petr's Mem. at 5.  This hyperbolic claim is nonsensical.  Judge Green's ruling only applied to the enumerated coordinated cases in which it was entered, at a time when this case had not even been filed.  Another Judge, ruling on the same motion, dismissed other Guantanamo detainee cases.  Judge Green's holding in In re Guantanamo Detainee Cases does not govern this case any more than does Judge Leon's holding in Khalid.  In any event, neither of those decisions speaks to the propriety of enjoining transfers and releases of detainees, an issue that simply was not before the Court at that time.

for finding a likelihood of success in obtaining an order barring a transfer or repatriation.  The

D.C. Circuit has held that "the 1949 Geneva Convention does not confer upon [a detainee] a right

to enforce its provisions in court."  Hamdan v. Rumsfeld, 415 F.3d 33, 40 (D.C. Cir. 2005), cert.

granted, 74 U.S.L.W. 3108 (Nov. 7, 2005).  In any event, neither this petitioner nor any others

have identified any provision in any treaty that is in conflict with the United States' policy

governing transfers and repatriations of individuals detained at Guantanamo by the Department

of Defense, or that would be violated by a transfer or repatriation undertaken in accordance with

that policy.[10]

### B.    Separation-of-Powers Principles Militate Heavily Against Petitioner's Likelihood of Success

Further, even if some valid claim or other legal basis existed for judicial involvement in

transfer or repatriation decisions with respect to enemy combatants held abroad, or for an

advance notice requirement to support and facilitate such involvement, the separation of powers

would bar such relief.  "[I]t is beyond the judicial function for a court to review foreign policy

decisions of the Executive Branch."  People's Mojahedin Org. v. Dep't of State, 182 F.3d 17, 23

(D.C. Cir. 1999) (citing Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333

---

[10] Without development, petitioner vaguely insinuates that the International Covenant on Civil and Political Rights ("ICCPR") and the Convention Against Torture and Other Cruel and Degrading Treatment and Punishment ("CAT") could be a legal basis for an order prohibiting a transfer.  However, no Judge has adopted those arguments, and, indeed, numerous courts have held, just as the D.C. Circuit has now held with respect to the Geneva Conventions, that those treaties do not give rise to judicially enforceable rights.  See, e.g., Sosa v. Alvarez-Machain, 124 S. Ct. 2739, 2767 (2004) (ICCPR); In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443, 480 (D.D.C. 2005) (ICCPR); Khalid v. Bush, 355 F. Supp. 2d 311, 327 (D.D.C. 2005) (ICCPR and CAT); see also Al-Anazi, 370 F. Supp. 2d at 194 (rejecting petitioners' argument that Foreign Affairs Reform and Restructuring Act of 1998, which implemented CAT in certain immigration-specific contexts, could serve as legal basis for prohibiting or limiting transfer of wartime detainees to other countries).

U.S. 103 (1948)); see also Holmes v. Laird, 459 F.2d 1211, 1215 (D.C. Cir. 1972) ("In situations

such as this, '[t]he controlling considerations are the interacting interests of the United States and

of foreign countries, and in assessing them [the courts] must move with the circumspection

appropriate when [a court] is adjudicating issues inevitably entangled in the conduct of our

international relations.'") (quoting Romero v. International Terminal Operating Co., 358 U.S.

354, 383 (1959)).[11]  If the Court were to entertain petitioner's claims to a right to contest

repatriation or removal from Guantanamo, it would insert itself into the most sensitive of

diplomatic matters.  Judicial review of a transfer or repatriation decision could involve scrutiny

of United States officials' judgments and assessments on the likelihood of torture in a foreign

country, including judgments on the reliability of information and representations or the

adequacy of assurances provided, and confidential communications with the foreign government

and/or sources therein.  Prosper Decl. ¶¶ 9-12.  Disclosure and/or judicial review of such matters

could chill important sources of information and interfere with our ability to interact effectively

with foreign governments.  Prosper Decl. ¶¶ 9-12; Waxman Decl. ¶ 8.  In particular, the foreign

government in question, as well as other governments, would likely be reluctant to communicate

frankly with the United States in the future concerning torture and mistreatment concerns.

Prosper Decl. ¶¶ 10, 12.  This chilling effect would jeopardize the cooperation of other nations in

---

[11] In Holmes, U.S. citizen servicemembers sued to prevent the United States government
from surrendering them to West German authorities to serve sentences for convictions by West
German courts on criminal charges relating to their conduct while stationed in West Germany.
Even in this situation involving U.S. citizens, the District Court and D.C. Circuit rejected the
plaintiffs' invitation to examine the fairness of their treatment by the West German courts and
declined to enjoin the transfer, the latter court holding that "the contemplated surrender of
appellants to the Federal Republic of Germany is a matter beyond the purview of this court."  459
F.2d at 1225.

the war on terrorism.  Prosper Decl. ¶¶ 10, 12; Waxman Decl. ¶ 8.

Because of these foreign relations implications, as developed most extensively in the analogous context of extradition, courts have uniformly eschewed inquiry into "'the fairness of a requesting nation's justice system'" and "'the procedures or treatment which await a surrendered fugitive in the requesting country.'"  United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir. 1997) (quoting Arnbjornsdottir-Mendler v. United States, 721 F.2d 679, 683 (9th Cir. 1983)); see Al-Anazi, 370 F. Supp. 2d at 194 (holding that this "well-established line of cases in the extradition context" "counsel[s] even further against judicial interference").  This principle is sometimes called the Rule of Non-Inquiry.  For example, in Ahmad v. Wigen, 910 F.2d 1063 (2d Cir. 1990), a United States citizen was extradited from the United States to Israel to stand trial for an alleged terrorist attack.  While the district court upheld the extradition only after receiving testimony and extensive documentation concerning Israel's law enforcement system and treatment of prisoners, the Second Circuit held that such inquiry was wholly improper.  "The interests of international comity are ill-served," the Second Circuit explained, "by requiring a foreign nation such as Israel to satisfy a United States district judge concerning the fairness of its laws and the manner in which they are enforced."  Id. at 1067.  "It is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds."  Id. Accord Escobedo v. United States, 623 F.2d 1098, 1107 (5th Cir. 1980) (refusing to bar extradition based on allegations that appellant "may be tortured or killed if surrendered to Mexico," because "the degree of risk to [Escobedo's] life from extradition is an issue that properly falls within the exclusive purview of the executive branch" (internal quotation marks omitted)); Peroff v. Hylton, 563 F.2d 1099, 1102 (4th Cir. 1977); Matter of Extradition of

17

Sandhu, 886 F. Supp. 318, 321-23 (S.D.N.Y. 1993); Hoxha v. Levi, 371 F. Supp. 2d 651, 659-61

(E.D. Pa. 2005) (holding that allegations that individual would be tortured after extradition to

Albania were solely for the Secretary of State to weigh, and not an appropriate subject for

judicial inquiry), on appeal, No. 05-3149 (3d Cir.).  See generally Jacques Semmelman, Federal

Courts, the Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings,

76 Cornell L. Rev. 1198 (1991).

        The force of these principles is not diminished by the fact that petitioner seeks judicial

review of any kind of transfer, repatriation or removal from Guantanamo, rather than merely

trying to block an extradition.  The considerations that underlie the Rule of Non-Inquiry are not

endemic to the specific context of extradition, but instead rest on the constitutional separation of

powers.[12]  See Matter of Requested Extradition of Smyth, 61 F.3d 711, 714 (9th Cir. 1995)

---

        [12] Some petitioners in Guantanamo detainee habeas cases have argued that the Rule of
Non-Inquiry is contingent on the existence of an extradition treaty, citing In re Extradition of
Howard, 996 F.2d 1320, 1329 (1st Cir. 1993).  However, the applicable language from Howard
was characterized as dicta by the First Circuit in a subsequent decision.  Kin-Hong, 110 F.3d at
111 n.12.  In that later case, while pretermitting the question "[w]hether the doctrine is
constitutionally mandated" as "immaterial here," the First Circuit cited an analogy to the act-of-
state doctrine and described the doctrine using language imbued with constitutional significance.
See id. at 110-11 ("The rule of non-inquiry, like extradition procedures generally, is shaped by
concerns about institutional competence and by notions of separation of powers.  It is not that
questions about what awaits the relator in the requesting country are irrelevant to extradition; it is
that there is another branch of government, which has both final say and greater discretion in
these proceedings, to whom these questions are more properly addressed.") (citation omitted).

        Moreover, to the extent that petitioner may contend that the only possible way to
repatriate him would be pursuant to an extradition treaty or statute, such a contention would be
wholly without merit.  See United States v. Alvarez-Machain, 504 U.S. 655 (1992); Ker v.
Illinois, 119 U.S. 436 (1886); Coumou v. United States, 107 F.3d 290, 295 (5th Cir. 1997)
(reversing lower court's holding, 1995 WL 2292, *11 (E.D. La. Jan. 3, 1995), that "[n]or did the
United States, or its officers or agents, have the discretion to deliver an arrested person to the
government of Haiti, unless the extradition laws of the United States were followed").

("Undergirding this principle is the notion that courts are ill-equipped as institutions and ill-advised as a matter of separation of powers and foreign relations policy to make inquiries into and pronouncements about the workings of foreign countries' justice systems."); Sandhu, 886 F. Supp. at 321 ("The rule of non-inquiry arises from recognition that the executive branch has exclusive jurisdiction over the country's foreign affairs."); cf. Holmes, 459 F.2d at 1219-23 (holding, in a non-extradition context, that considerations similar to those embodied in the Rule of Non-Inquiry made it improper for the Judiciary to examine allegations of unfairness in a foreign nation's trial of a U.S. citizen). Thus, petitioner cannot turn to the courts to second-guess Executive judgments about matters such as custodial conditions and/or the adequacy of legal procedures in a foreign country, as well as the credibility and adequacy of a foreign government's assurances. Cf. People's Mojahedin, 182 F.3d at 23 (expressing reluctance of courts to interfere in matters "'for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry'" (quoting Chicago & Southern, 333 U.S. at 111)).

***

Thus, there is no basis in law for an injunction requiring advance notice of an upcoming transfer or repatriation in order to enable petitioner to seek a judicial order blocking it. Neither the Court's habeas corpus jurisdiction nor any other legal authority supports the notion of ordering custody that the United States wishes to relinquish to nevertheless be artificially and indeterminately prolonged purely to preserve a live case for the Court. And, apart from the absence of affirmative legal authority, separation of powers considerations and foreign relations sensitivities preclude a judicial inquiry in which this Court would substitute its judgment

19

regarding the appropriateness of repatriation for that of the appropriate Executive Branch officials.

## IV.    AN INJUNCTION REQUIRING ADVANCE NOTICE WOULD TRAMPLE ON THE SEPARATION OF POWERS

It is undisputed that the sole reason petitioner seeks advance notice is to enable him to seek an order blocking or changing a transfer or repatriation decision that the Executive would already have made after consultation and coordination with the foreign government in question. See, e.g., Petr's Mem. at 5-6 (arguing that advance notice is necessary so that petitioner "be provided with a meaningful opportunity to contest his transfer"). Such an advance notice requirement foreshadows judicial review and intervention that would be accompanied by the attendant harms discussed in the declarations of Deputy Assistant Secretary Waxman and then Ambassador Prosper submitted herewith. See Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12. Even if such judicial review did not ultimately result in an injunction against transfer, the mere inquiry into the United States' dialogue with foreign nations and into the terms of a transfer and any assurances that may have been obtained would cause grave harm. See supra Section III.B (describing interests of international comity that underlie the Rule of Non-Inquiry); Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12. Moreover, the very prospect of judicial review, as exemplified by an advance notice requirement, causes separation-of-powers harm by undermining the ability of the Executive Branch to speak with one voice in its dealings with foreign nations. See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 381 (2000) (expressing disapproval of acts that "compromise the very capacity of the President to speak for the nation with one voice in dealing with other governments"). An advance notice requirement,

after all, would make the results of diplomatic dialogue between the Executive Branch and a

foreign government regarding repatriations or transfers inherently contingent because the

effective acquiescence of another Branch (i.e., the Judiciary) would be required for a transfer or

repatriation to go forward, and such a requirement would also inject delays into future transfers.

These harms weigh heavily against entry of a preliminary injunction.

## V.    AN INJUNCTION WOULD DISSERVE THE PUBLIC INTEREST

The public interest favors allowing the Executive Branch, which is constitutionally vested

with the authority both to conduct military functions, such as detention of enemy combatants for

the duration of hostilities, and to engage in foreign relations, to act without undue intrusion

within its constitutional sphere of responsibility.[13]   Indeed, as a Judge of this Court has held:

> [T]here is a strong public interest against the judiciary needlessly intruding upon
> the foreign policy and war powers of the Executive on a deficient factual record.
> Where the conduct of the Executive conforms to law, there is simply no benefit –
> and quite a bit of detriment – to the public interest from the Court nonetheless
> assuming for itself the role of a guardian ad litem for the disposition of these
> detainees.  See People's Mojahedin Org., 182 F.3d at 23 ("[I]t is beyond the
> judicial function for a court to review foreign policy decisions of the Executive
> Branch.").

Al-Anazi, 370 F. Supp. 2d at 199.  Here, as well, the public interest disfavors an injunction.

---

[13] While this Court and another Judge, in granting preliminary injunctions, have cited the
general proposition that "[i]t is always in the public interest to prevent the violation of a party's
constitutional rights," G&V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1079
(6th Cir. 1994), cited in Al-Marri, 2005 WL 774847, at *6; Abdah, 2005 WL 711814, at *6,
respondents respectfully submit that such a formulation begs the question what violations of
constitutional rights (assuming arguendo that enemy aliens detained at Guantanamo possess
rights under the United States Constitution, but see Khalid v. Bush, 355 F. Supp. 2d 311, 320-23
(D.D.C. 2005)) are present or imminent here and stand to be prevented by an injunction.  As
discussed above, respondents' policy and practices governing transfer and repatriation of
Guantanamo detainees plainly do not violate any rights petitioner may have, constitutional or
otherwise.  The public interest does not support assuming without any foundation that Executive
Branch officials are wont to engage in constitutional violations unless supervised by the courts.

## <u>CONCLUSION</u>

For the reasons stated above, respondents respectfully request that petitioner's motion be held in abeyance unless and until petitioner's counsel come forward with information that enables positive identification of him as a specific actual detainee at Guantanamo.  If and when petitioner is so identified, respondents respectfully request that petitioner's motion for preliminary injunction be denied.

Dated: November 25, 2005                 Respectfully submitted,


PETER D. KEISLER
Assistant Attorney General


KENNETH L. WAINSTEIN
United States Attorney


DOUGLAS N. LETTER
Terrorism Litigation Counsel


 /s/ Robert J. Katerberg
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
TERRY M. HENRY
JAMES J. SCHWARTZ
PREEYA M. NORONHA
ROBERT J. KATERBERG
ANDREW I. WARDEN
NICHOLAS J. PATTERSON
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 514-4107
Fax:  (202) 616-8470

Attorneys for Respondents