*CLEARED FOR PUBLIC FILING*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                    )
**ABD AL HAKIM GHALIB**             )
**AHMAD ALHAG**,                    )
                                    )
      *Petitioner,*          )
                                    )
      *v.*                   )     Civil Action No. 1:05CV02199 (HHK)
                                    )
**GEORGE W. BUSH**, *et al.*,       )
                                    )
      *Respondents.*         )
_____)


**PETITIONER'S CONSOLIDATED MEMORANDUM IN OPPOSITION TO
GOVERNMENT'S MOTION TO EXAMINE PRIVILEGED
COMMUNICATIONS SEIZED WITHOUT NOTICE OR APPROVAL,
AND IN SUPPORT OF MOTION TO SHOW CAUSE WHY
RESPONDENTS SHOULD NOT BE HELD IN CONTEMPT**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

ARGUMENT ........................................................................................................... 3

I.   THE GOVERNMENT SHOULD BE SANCTIONED FOR SEIZING THE
     PRISONERS' LEGAL PAPERS WITHOUT NOTICE AND APPROVAL......................... 3

II.  THE PREMISE OF THE GOVERNMENT'S INVESTIGATION IS INVALID, AND
     ITS MOTION IS PREMATURE...................................................................... 6

III. THE GOVERNMENT'S SEIZURE AND EXAMINATION OF PETITIONER'S
     LEGAL PAPERS WAS UNLAWFUL. .............................................................. 8

     A.  The Government Has Long Sought To Thwart The Attorney-Client
         Relationship. ................................................................................... 9

     B.  The Prisoners' Legal Papers May Not Be Seized and Reviewed Without An
         Individualized Showing of Probable Cause. .................................... 10

     C.  The Government Has Made No Such Individualized Showing. ...................... 14

IV.  ANY FURTHER REVIEW OF THE PRISONERS' LEGAL PAPERS SHOULD BE
     BY THE COURT OR A SPECIAL MASTER...................................................... 17

V.   REQUEST FOR ORAL ARGUMENT .............................................................. 19

CONCLUSION....................................................................................................... 20

DSMDB-2117184v01

# TABLE OF AUTHORITIES

*Adem v. Bush*, 425 F. Supp. 2d 7 (D.D.C. 2006) ........................................................11

*Al Odah v. United States*, 346 F. Supp. 2d 1 (D.D.C. 2004) ................................12, 14, 19, 20, 21

*Bach v. Illinois*, 504 F.2d 1100 (7th Cir. 1974) ........................................................13

*Black v. United States*, 172 F.R.D. 511 (S.D. Fla. 1997).............................................20

*Carter v. Hutto*, 781 F.2d 1028 (4th Cir. 1986)........................................................14

*Doe v. United States*, No. 03-6145, 2003 WL 22879314 (2d Cir. Dec. 4, 2003) ...........................15

*Goff v. Nix*, 113 F.3d 887 (8th Cir. 1997)........................................................13

*In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32 (2d Cir. 1986) ......................................15

*In re Grand Jury Subpoenas 04-124-03 and 04-124-05*, Nos. 05-2274/2275
    (6th Cir. July 13, 2006) ........................................................21

*Hiney v. Wilson*, 520 F.2d 589 (2d Cir. 1975) ........................................................14

*Johnson-El v. Schoemehl*, 878 F.2d 1043 (8th Cir. 1989) ........................................................12

*Lanza v. State of New York*, 370 U.S. 139 (1962) ........................................................12

*McCreary County v. ACLU of Ky.*, 125 S. Ct. 2722 (2005) ........................................................11

*Procunier v. Martinez*, 416 U.S. 396 (1974) ........................................................13

*Rasul v. Bush*, 542 U.S. 466 (2004)........................................................11

*In re Richard Roe, Inc.*, 68 F.3d 38 (2d Cir. 1995)........................................................15

*In re Sealed Case*, 107 F.3d 46 (D.C. Cir. 1997)........................................................15

*In re Search of the Scranton Housing Authority*, No. 04-MISC
    Nos. 318-322, 2006 WL 1722565 (M.D. Pa. June 22, 2006) ........................................................20

*In re Search Warrant for Law Offices*, 153 F.R.D. 55 (S.D.N.Y. 1994) ........................................................21

*Simmons v. Dickhaut*, 804 F.2d 182 (1st Cir. 1986) ........................................................13

*Swidler & Berlin v. United States*, 524 U.S. 399 (1998) ........................................................12

ii

*United States v. Abbell*, 914 F. Supp. 519 (S.D. Fla. 1995) ..........................................................20

*United States v. Grant*, CR 207, 2004 WL 1171258 (S.D.N.Y. May 25, 2004) ...........................16

*United States v. Neill*, 952 F. Supp. 834 (D.D.C. 1997)..............................................................21

*United States v. Skeddle*, 989 F. Supp. 890 (N.D. Ohio 1997).......................................................16

*United States v. Stewart,* No. CR 396 JGK, 2002 WL 1300059
    (S.D.N.Y. June 11, 2002)......................................................................................................15, 21

*United States v. Zolin*, 491 U.S. 554 (1989) ...............................................................................16

*Upjohn Co. v. United States*, 449 U.S. 383 (1981).......................................................................12

*Wright v. Newsome*, 795 F.2d 964 (11th Cir. 1986) ....................................................................14

DSMDB-2117184v01

**INTRODUCTION**

The government's motion should be denied. The materials in question are privileged attorney-client communications. As a matter of fundamental principle, and by specific order of this Court, those communications were supposed to be secure. The government's seizure and review of those communications, without prior approval from the Court and without notice to counsel was illegal. The government's failure to disclose its actions until nearly a month after the fact is inexcusable  In the name of investigating three prisoner deaths, the government has ravaged a fundamental privilege and shattered any confidence the prisoners might have had in that privilege. The American Bar Association has called for an investigation of the military's massive breach of the privilege and the Justice Department's negligence, or worse, in allowing it to occur. [1]

The stakes are too high for the Court to accept the unsupported assertions that underlie the government's motion, including its claim that the privileged communications were examined in the course of an investigation into the suicides of three prisoners. Without verification, the Court cannot be certain that the deaths *were* suicides. The government also claims that the communications initially seized supported the seizure and review of all of the remaining privi-

---

[1]     *See* Letter dated July 11, 2006, from Michael S. Greco, President, American Bar Association, to Senators Arlen Specter and Patrick Leahy (Ex. 1 hereto).

leged communications. Without examining the communications, the Court cannot be certain *what* was seized and reviewed.

At present, we do not allege that the prisoner deaths occurred other than by suicide, or that the government is concealing wrongdoing. On the other hand, the government's proffered justifications may be a pretext for collecting intelligence and wrecking attorney-client relationships. In view of the privilege at issue, the Court should not simply take the word of the very persons who seized and reviewed the materials at issue.

Indeed, the Court should order the government to show cause why it should not be sanctioned for seizing and reviewing the prisoners' legal papers without approval from the Court and notice to counsel, and for failing to report its actions until nearly a month after the fact, and only when habeas counsel began to seek relief.[2] The Court also should consider and rule upon the legality of the Department of Justice's failure to protect the privilege, by neglect or by design, and prescribe procedures that will prevent future invasions of the privilege.

Finally, the Court should order the government to deliver the prisoners' legal papers to counsel or the Court immediately, to destroy all copies, summaries, descriptions, or analyses of the papers, and to refrain from any further review of any prisoner's legal papers without first of-

_____

[2]    The order submitted herewith directs Respondents to provide evidence under oath from a witness with personal knowledge of the handling of the privileged materials, including the identity of persons who have read them and the substance of the analyses that have been made of them. This testimony must be subject to cross-examination, so counsel and the Court can assess the need for further procedures.

DSMDB-2117184v01

fering this Court a particularized justification.  Finally, any such further review should be conducted by the Court or a special master.

## ARGUMENT

**I.    THE GOVERNMENT SHOULD BE SANCTIONED FOR SEIZING THE PRISONERS' LEGAL PAPERS WITHOUT NOTICE AND APPROVAL.**

On June 10, 2006, the military reported that three prisoners at Guantánamo Bay had been found dead in their cells with wads of cloth in their mouths.[3]  The military reported the prisoners' deaths as suicides.[4]

In his news conference, Navy Rear Adm. Harry B. Harris, the Commander of Joint Task Force–Guantánamo, denounced the deaths as acts of war:  "I believe this was not an act of desperation, but an act of asymmetric warfare aimed at us here at Guantánamo."  "We have men here who are committed jihadists.  They are dangerous men and they will do anything they can to

---

[3]    Colonel Mike Bumgarner, the commander of the prison, stated in an interview that each of the prisoners was found with "a large wad of cloth in his mouth"; Colonel Bumgarner stated that he "did not know if the material was for choking or to muffle their voices while they took their lives."  Michael Gordon, *Officer Expects More Suicide Tries*, Charlotte Observer, June 12, 2006, *available at* http://www.charlotte.com/mld/charlotte/news/14797522.htm.

[4]    U.S. Southern Command News Release, *Three Detainee Deaths at Guantanamo Bay*, June 10, 2006, *available at* http://www.southcom.mil/pa/Media/Releases/USSOUTHCOM%20 PRESREL%20Detainee%20Death%20FINAL%20%20(1415%2010%20Jun%2006).doc;  *Gen. John Craddock's Opening Statement*, Press Conference, June 10, 2006, *available at* http://www. southcom.mil/pa/News/June%202006/News060610-001.htm; Sara Wood, *Three Guantanamo Bay Detainees Die of Apparent Suicide*, June 10, 2006, *available at* http://www.defenselink.mil/ news/Jun2006/20060610_5379.html.

DSMDB-2117184v01

advance their cause."[5]  Colleen Graffy, Deputy Assistant Secretary of State for Public Diplomacy, called the deaths a "good PR move."[6]

According to the declarations of Admiral Harris and Special Agent Carol Kisthardt in support of the government's motion, the Naval Criminal Investigative Service (NCIS) initiated an investigation to determine "the manner and cause of death" of the three prisoners.[7]  Autopsies were to be performed, but, to counsel's knowledge, results have not been made public.

Now, nearly a *month* later, the government has disclosed that, between June 10 and June 14, as part of the purported "investigation," NCIS seized and examined over a half-ton of written materials, including communications between Guantánamo prisoners and their lawyers.[8]  This seizure and examination violated this Court's orders requiring the government to respect the attorney-client privilege, including the Protective Order.

————————————————

[5]  Wood, *supra* note 3.  Admiral Harris has stated:  "Asymmetrical warfare is the idea that in a war between two entities, the lesser entity will use completely unorthodox and perhaps illegal means to try to gain an upper hand or the upper hand."  Transcript, *Inside Guantanamo*, Fox News Network, June 12, 2006, at 3, available on Lexis-Nexis.

[6]  Catherine Philip, *US Dismisses Suicides as "PR Stunt,"* London Times, June 12, 2006, *available at* http://www.timesonline.co.uk/article/0,,11069-2221381,00.html; *see also* Reuters, *Three Guantanamo Detainees Die, US Army*, June 11, 2006, *available at* http://www.cageprisoners.com/articles.php?id=14371.

[7]  Harris Decl. ¶ 2; Kisthardt Decl. ¶ 2.

[8]  Kisthardt Decl. ¶¶ 2-5.

4

The government claims that it seized numerous prisoners' legal papers because notes found in the cells of the dead prisoners suggested that they might have used the privilege to cloak a suicide "plot," perhaps "encouraged, ordered, or assisted by third parties."[9] On the present record, there is no way to know whether the notes suggested such a use of the privilege and, if so, whether it was a sufficient reason for the government's subsequent actions.

The government now asks the Court to condone its actions and permit it to examine the seized materials even more closely. The government sought this blanket, *post hoc* permission only after habeas counsel, once informed by their clients of the nature of the government's actions, began to seek relief.[10] This belated request for *post hoc* permission is unsupported by fact, law, or logic.

There was simply no emergency requiring the government to act without the *prior* approval of the Court, as evidenced by the *five-day* period over which the government conducted the seizures. At the very least, a conference call with counsel and the Emergency Judge on the first of the five days at issue could have been arranged. *See* LCvR 40.1(c), 65.1, 57.8. The government's failure to approach the Court when doing so actually could have mattered is, in and of itself, sufficient reason to deny the government's present motion.

_____

[9]     Harris Decl. ¶ 4.

[10]     Mot. To Modify Stay To Direct Resp'ts To Return Impounded Privileged Legal Material and for Other Relief, *Abdullah v. Bush*, No. 05-00023 (RWR) (filed July 5, 2006). The government states that its instant motion is an opposition to the *Abdullah* motion. U.S. Mot. at 1 n.1.

DSMDB-2117184v01

Additionally, the Justice Department itself either approved the military's unilateral seizure of privileged materials, or failed to prevent it.  The Department's failure to disclose the seizure until habeas counsel forced its hand suggests that the Department was complicit in the seizure to some degree.  The Court should hold Respondents in contempt, sanction the government for its devious conduct, and refer the matter to the Justice Department's Office of Professional Responsibility, as urged by the ABA.

## II.    THE PREMISE OF THE GOVERNMENT'S INVESTIGATION IS INVALID, AND ITS MOTION IS PREMATURE.

The Court should not allow the government to conduct further examinations of the seized materials on the premise that the deaths, if suicides, were acts of "warfare" or "a good PR move," or that other prisoners may be "plotting" to take their own lives.  The government is transparently attempting to obscure its own responsibility for the prisoners' unlawful and -- so far as the prisoners know -- *infinite* detentions.  The conditions that the government created are the more logical explanation for any suicides in that camp.[11]

––––––––––––––––––––––––

[11]    *See* Mark Denbeaux, *Report: The Guantánamo Detainees During Detention* (July 10, 2006), at 17-18 (Ex. 2 hereto).  As Physicians for Human Rights has stated, "psychological torture [is] central to the interrogation process and reinforced through conditions of confinement."  Physicians for Human Rights, *Break Them Down: Systematic Use of Psychological Torture by US Forces* 1 (2005).  Approved interrogation techniques have included "Removal from social support at Camp Delta"; "Segregation in Navy Brig"; "Isolation in Camp X-Ray"; "Deprivation of light"; "Inducing stress [through] use of female interrogator"; "Up to 20-hour interrogations"; "Removal of all comfort items, including religious items."  Dep't of Defense, *GTMO Interrogation Techniques* (June 22, 2004).  Evidence indicates that the government has also used even

(continued...)

6

These conditions have a long and sordid history of causing the mental health of Guantánamo prisoners to deteriorate.  According to the government's own data, prisoners committed 350 acts of "self-harm" in 2003, including 120 attempted hangings.[12]  In August 2003 alone, 23 men attempted to hang themselves.[13]  The government chose to describe all but two of these hangings as incidents of "manipulative self-injurious behavior," rather than as suicide attempts.[14]  In 2004, also according to government data, prisoners committed another 110 acts of such "manipulative self-injurious behavior," though it did not report how many of these 110 incidents were attempted hangings.[15]  Even with its penchant for Orwellian language, the government acknowledges that at least 29 prisoners have attempted suicide a total of 41 times.

Last fall, counsel for Jumah al Dossari found his client hanging from the wire meshing of an interview cell, his wrist slashed and a pool of blood gathering beneath him.  On May 18, 2006, four more prisoners reportedly attempted suicide by overdosing on medicines they had hoarded; in a statement released the following day, Admiral Harris stated that only two of these

---

more brutal techniques, labeled "Fear Up Harsh," "Sleep Adjustment," and "Futility."  Dep't of Defense, *Working Group Report on Detainee Interrogations in the Global War on Terrorism: Assessment of Legal, Historical, Policy, and Operation Considerations* at A1-A3 (2003), *available at* http://www.ccr-ny.org/v2/reports/docs/PentagonReportMarch.pdf.

[12]    Denbeaux, *supra* note 11, at 6.

[13]    *Id.*

[14]    *Id.* at 14.

[15]    *See id.* at 6.

DSMDB-2117184v01

efforts were counted as "suicide attempts," apparently because only two prisoners lost consciousness following their attempts.[16]  Admiral Harris then called two additional prisoners "attention-seeking sympathizers who were not trying to actually commit suicide."[17]

Less than a month later, on June 10, 2006, the three deaths that led to the instant motion occurred.  In light of Guantánamo's history, the deaths – if suicides – are logically understood as acts of despair.  The government's own, darker explanation may or may not be "good PR," but it is surely not a justification for ransacking the privilege.

**III.    THE GOVERNMENT'S SEIZURE AND EXAMINATION OF PETITIONER'S LEGAL PAPERS WAS UNLAWFUL.**

This Court has ruled that prisoners held at Guantánamo have a right to counsel.  The Court has recognized that the attorney-client privilege attaches to communications between the prisoners and their lawyers, and it has sought to protect that privilege by establishing appropriate procedures.  The Court should not now ratify the government's proposed, future violations of the Court's orders.

_____

[16]     Kathleen T. Rehm, *Skirmish With Guards, Two Suicide Attempts Test Guantanamo Procedures*, May 19, 2006, *available at* http://www.defenselink.mil/news/May2006/20060519_5177.html.

[17]     Dep't of Defense, *Statement on Suicide Attempts at Guantanamo*, May 19, 2006, *available at* http://www.southcom.mil/PA/Media/Releases/Media%20Advisory%20-%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%20-%201%20-%20Press%20briefing.pdf.

DSMDB-2117184v01

A.     **The Government Has Long Sought To Thwart The Attorney-Client Rela-tionship.**

When it comes to undermining the attorney-client relationship, the government is a hard-ened offender.  The Court should consider the government's recent actions, and its present re-quest for relief, in light of its five-year campaign to violate that relationship.

Most of the prisoners at Guantánamo have been held there for more than four years. When the first habeas petitions were filed in early 2002, the government asserted that the prison-ers had no right to seek relief in federal court and did not have any other rights that a federal court could enforce.  While these issues were being litigated, the prisoners were denied access to counsel.

In 2004, the Supreme Court rejected "the proposition of Guantánamo Bay as a legal black hole."[18]  Unfazed, the government insisted that "detainees' access to counsel existed purely at the pleasure of the government, with restrictions to be imposed as it saw fit."[19]  This Court "flatly re-jected" the government's position and its effort to impose "significant restrictions on attorney-client communications, including real-time monitoring of counsel meetings with detainees."[20]

Once counsel began to meet with their clients, the government immediately began un-

---

[18]     *Adem v. Bush*, 425 F. Supp. 2d 7, 11 (D.D.C. 2006) (citing *Rasul v. Bush*, 542 U.S. 466 (2004)).

[19]     *Id.* at 12.

[20]     *Id.* at 11–12.

DSMDB-2117184v01

dermining the attorney-client relationship. Interrogators told several Petitioners and other prisoners that their lawyers were spies. Interrogators asked other prisoners, "did you know your lawyers are Jews?"[21] They also warned prisoners that they would never be released if they retained counsel. Immediately after they met with their lawyers for the first or second time, several Petitioners were forced to wear immodest clothing, subjected to extreme temperatures, or prohibited from praying, and several prisoners had their legal papers searched, in a foreshadowing of the half-ton seizure that has led us here. In these circumstances, the Petitioners reasonable suspicion of their own attorneys will intensify if and when they learn that their privileged materials are being reviewed by the government.

**B.      The Prisoners' Legal Papers May Not Be Seized and Reviewed Without An Individualized Showing of Probable Cause.**

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law."[22] Its purpose is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."[23] As this Court has recognized in the context of the

---

[21]     Frank Davies, U.S. Interrogators Accused of Trying to Divide Detainees, Attorneys (Knight Ridder), May 13, 2005, available at http://www.commondreams.org/headlines05/0513-04.htm.

[22]     *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

[23]     *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998); *see also Lanza v. State of New York*, 370 U.S. 139, 143-44 (1962) ("[I]t may be assumed that even in a jail, or perhaps es-
                                                                                   (continued...)

DSMDB-2117184v01

Guantánamo litigation, "[t]he privilege that attaches to communications between counsel and client has long held an exceptional place in the legal system of the United States."[24]

Nowhere is the effectuation of the privilege more important than in the context of pretrial detention. "An inmate's need for confidentiality in his communications with attorneys through whom he is attempting to redress his grievances is particularly important."[25] For such prisoners, "contact with an attorney and the opportunity to communicate privately is a vital ingredient to the effective assistance of counsel and access to the courts."[26] Even for prisoners convicted of crimes, the Supreme Court has held, "[r]egulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right to access to the courts are invalid."[27]

Seizure of legal papers strikes at the heart of the attorney-client relationship. It chills the giving, receiving, and continued possession of communications from attorney to client, particu-

———————————

pecially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection.").

[24]   *Al Odah v. United States*, 346 F. Supp. 2d 1, 10 (D.D.C. 2004).

[25]   *Bach v. Illinois*, 504 F.2d 1100, 1102 (7th Cir. 1974); *see also Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir. 1989) ("Pretrial detainees have a substantial due process interest in effective communication with their counsel and in access to legal materials. When this interest is inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised.").

[26]   *Bach*, 504 F.2d at 1102.

[27]   *Procunier v. Martinez*, 416 U.S. 396, 419 (1974).

DSMDB-2117184v01

larly when seized without notice to the prisoners' attorneys or the court. Thus, the courts recognize that "[t]he taking of legal papers will often (though perhaps not always) interfere with an inmate's right of access to the courts. . . . [T]he destruction or withholding of inmates' legal papers burdens a constitutional right, and can only be justified if it is reasonably related to a legitimate penological interest."[28]

More to the point, *this* Court has recognized that the prisoners – who have not been charged or tried, and who seek the opportunity through their counsel to challenge the basis of their detention – have a right to a confidential relationship with their counsel.[29] Thus, "the Court determine[d] that the government is not entitled to unilaterally impose procedures that abrogate the attorney-client relationship and its concomitant attorney-client privilege covering communications between them."[30] The Court implemented Access Procedures that guaranteed confidential communication between prisoners and their attorneys through rules for in-person meetings

---

[28]    *Goff v. Nix*, 113 F.3d 887, 892 (8th Cir. 1997) (internal citations omitted); *see also Simmons v. Dickhaut*, 804 F.2d 182, 183–84 (1st Cir. 1986) ("Many courts have found a cause of action for violation of the right of access stated where it was alleged that prison officials confiscated and/or destroyed legal materials or papers."); *Wright v. Newsome*, 795 F.2d 964, 968 (11th Cir. 1986) ("The allegation that prison officials seized [the plaintiff's] pleadings and law book and destroyed other legal papers clearly states a claim of denial of access to the courts."); *Carter v. Hutto*, 781 F.2d 1028, 1031–32 (4th Cir. 1986) (plaintiff alleged a valid claim of denial of access to courts when he alleged that his legal materials were confiscated or destroyed); *Hiney v. Wilson*, 520 F.2d 589, 591 (2d Cir. 1975) (alleged confiscation of legal papers would have denied plaintiff access to the courts).

[29]    *Al Odah*, 346 F. Supp. 2d at 5.

[30]    *Id.*

12

and written communications. *The Court rejected the government's request to monitor these communications.*

The government's vague assertion here that it found notes written by one prisoner in the cell of another, recently deceased prisoner logically cannot establish a "legitimate penological interest" in seizing *all* legal documents from *all* prisoners, and it makes a mockery of this Court's prior rejection of government monitoring of attorney-client communications. Abrogation of the privilege for those communications requires the government to make a specific, *individualized* showing that there is sufficiently compelling justification. For example, where the government invokes the crime-fraud exception to the attorney-client privilege, it bears the burden of making an adequate showing of the alleged abuse of the privilege.[31] Similarly, when the government seizes materials from a location that likely contains privileged papers, the seizure must be supported by probable cause and a warrant, and the government must employ appropriate means of screening out privileged materials.[32] Even when the Court itself reviews such documents *in*

---

[31] *In re Sealed Case*, 107 F.3d 46, 49 (D.C. Cir. 1997); *see also Doe v. United States*, No. 03-6145, 2003 WL 22879314 (2d Cir. Dec. 4, 2003) (reversing contempt order where government failed to meet burden of showing that crime-fraud exception applied); *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) (requiring a showing of probable cause to believe that a crime or fraud has been attempted or committed and that attorney-client communications were used to further that crime or fraud); *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986) (reversing civil contempt order because the government did not satisfy its burden of showing that the crime-fraud exception applied to the documents the corporation failed to produce).

[32] *See, e.g., United States v. Stewart*, No. CR 396 JGK, 2002 WL 1300059 (S.D.N.Y. June 11, 2002).

13

*camera,* "the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that . . . *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."[33]  The government has not cited any case suggesting that its invasion of the privilege here, *without* a prior individualized showing that any *particular* materials of any *particular* client or attorney were abused in any way.[34]

### C.    The Government Has Made No Such Individualized Showing.

The government has presented no individualized evidence that Petitioner has misused his legal papers.  The documents cited by the government as evidence of "wrongdoing" are simply not specific evidence concerning *Petitioner*.  The documents were found either in the possession of one of the dead prisoners or were written by one of the dead prisoners, and on the present record, the documents reveal nothing about Petitioner.

Indeed, these documents do not constitute sufficient evidence with respect to *any* Petitioner.  The document labeled "FOUO," for instance, is a red herring.  "FOUO," or "For Official Use Only," is an internal Department of Defense designation related to the Freedom of Informa-

---

[33]    *United States* v. *Zolin*, 491 U.S. 554, 572 (1989) (quotations and citation omitted).

[34]    *See, e.g.*, *United States v. Skeddle*, 989 F. Supp. 890, 894 (N.D. Ohio 1997) (permitting review of attorney-client materials "[i]n light of the finding of probable cause that had preceded the issuance and execution of the warrant"); *United States v. Grant*, No. 04 CR 207, 2004 WL 1171258, at *2 (S.D.N.Y. May 25, 2004) (documents "seized pursuant to a valid warrant, which was based upon a [judicial] finding of probable cause").

DSMDB-2117184v01

tion Act.[35]  The designation is specifically not a "classification to protect national security inter-

ests"[36] and "is, by definition, unclassified."[37]  The Protective Order does not prevent prisoners

from being in possession of FOUO documents, which by definition represent no security risks.

Second, the document that is supposedly marked with a crossed-out "SECRET" stamp is

surely *not* a classified document at this time.  The Protective Order does not prevent prisoners

from possessing *formerly* classified documents, and the government's intimation that the docu-

ment may *really* be a classified document that habeas counsel smuggled out of the secure facil-

ity, doctored, and then sent back to a client is more amusing than enlightening.

Third, the so-called "knot-tying" document found by the government is not purported to

have been labeled "attorney-client material" and is not alleged to have been discovered in a pris-

oner's privileged legal folder.  It would seem to contain information otherwise available in the

Boy Scout *Handbook,* and it has no relevance to the instant motion, which seeks further review

of privileged items confiscated by the government.

Fourth, a supposed suicide note handwritten on the back of a piece of paper marked "at-

torney-client privileged" was quite obviously not being "hidden" by the author, who was leaving

it to posterity, after all, and he did not hide it in a privilege folder.  In all likelihood, the only

---

[35]    DoD Regulation 5200.1: C5.2.7.1.1.3 (emphasis added).

[36]    *Id.* 5400.7-R: C4.1.1.

[37]    *Id.* AP3.2.2.3.2.

"abuse" of the privilege was one prisoner's agreement to provide the deceased with a piece of paper on which he could express his last wishes.

Fifth, the government does alert counsel and the Court to a single document that – from the government's unsupported description -- likely should not have been in the possession of a prisoner.  Remarkably, however, the document is an *email from JTF-Guantánamo itself* – a document that obviously was not provided to a prisoner by counsel.  How did this document come into possession of a prisoner?  Did an interrogator or guard provide it?  The NCIS should be investigating Joint Task Force personnel, not ransacking the legal papers of every prisoner at Guantánamo.

Finally, the court already rejected generalized security concerns of the type the government invokes here.  When the government sought to justify the real-time monitoring and recording of attorney-client meetings, it claimed that the prisoners would use counsel "to further terrorist operations or otherwise disclose information that will cause immediate and substantial harm to national security."[38]  The Court rejected the claim, finding it "thinly supported."  Indeed, this Court previously reminded the government that its "decision to grant an individual attorney a security clearance amounts to a determination that the attorney can be trusted with information at that level of clearance."[39]

---

[38]    *Al Odah*, 346 F. Supp. 2d at 4 n.4.

[39]    *Al Odah*, 346 F. Supp. 2d at 14.

DSMDB-2117184v01

## IV.     ANY FURTHER REVIEW OF THE PRISONERS' LEGAL PAPERS SHOULD BE BY THE COURT OR A SPECIAL MASTER.

If *any* further review of the prisoners' legal papers is allowed, the use of a Department of

Defense Filter Team is inappropriate.  As the government essentially admits, *see* Resps.' Mot. 21

n.12, courts are reluctant to entrust privileged materials to government teams.  Indeed, "the use

of government taint teams has often been questioned or outright rejected by the courts."[40]  Just

last week, the Sixth Circuit overruled a district court's decision to permit review of potentially

privileged documents by an independent government "taint team," because the review posed un-

acceptable risks to the attorney-client privilege.[41]  "[A]t least three [of the] courts that have al-

lowed for review by a government privilege team have opined, in retrospect, that the use of other

methods of review would have been better."[42]

---

[40]     *In re Search of the Scranton Hous. Auth.*, No. 04-MISC Nos. 318-322, 2006 WL 1722565, at *5 (M.D. Pa. June 22, 2006); *see, e.g.*, *Black v. United States*, 172 F.R.D. 511, 516 (S.D. Fla. 1997) (even though government needed documents to pursue escaped fugitive, court rejected proposed "taint team" and ordered that "a United States district judge or his designee" would review documents for privilege); *United States v. Abbell*, 914 F. Supp. 519, 520–21 (S.D. Fla. 1995) (appointing special master rather than filter team to review potentially privileged documents obtained by search warrant).

[41]     *See In re Grand Jury Subpoenas 04-124-03 and 04-124-05*, Nos. 05-2274/2275, slip op. at 6 (6th Cir. July 13, 2006), *available at* http://www.ca6.uscourts.gov/opinions.pdf/06a0245p-06.pdf.

[42]     *United States v. Stewart*, No. 02 CR 396, 2002 WL 1300059, at *6 (S.D.N.Y. June 11, 2002).

17

Given the government's history of interfering with the attorney-client relationships at Guantanamo, as well as its professed desire to "exploit the 'intelligence value'" of attorney-client communications,[43] "it is important that the procedure adopted on this case not only be fair but also appear to be fair."[44] Yet "[i]t is a great leap of faith to expect that members of the general public would believe that any such Chinese wall would be impenetrable; this notwithstanding the honor of [those involved]."[45] Here, "there is no doubt that, at the very least, the 'taint team' procedures create an appearance of unfairness,"[46] simply by virtue of including government attorneys.

Another unacceptable aspect of the government's proposal is that the Filter Team would be allowed to conduct its own review of the confiscated documents to determine whether they are "privileged" in the first place, and whether they are relevant to the "suicide-plot" investigation.[47] It is not for a Filter Team to evaluate privilege claims. Such a procedure leaves "the government's fox . . . in charge of the [clients'] henhouse," with no check against the possibility that the Filter Team would draw "false negative conclusions" overriding legitimate claims of privi-

———————————————

[43]     *Al Odah*, 346 F. Supp. 2d at 10 n.11.

[44]     *Stewart*, 2002 WL 1300059, at *6.

[45]     *In re Search Warrant for Law Offices*, 153 F.R.D. 55, 59 (S.D.N.Y. 1994).

[46]     *United States v. Neill*, 952 F. Supp. 834, 841 n.14 (D.D.C. 1997).

[47]     *See* Resps.' Mot. at 11.

DSMDB-2117184v01

lege.[48]

The only acceptable procedure for further review of these materials would exclude government attorneys altogether, and allow the Court to make final determinations of privilege *in camera*, after Petitioners' counsel has inspected and determined whether to assert privilege over the seized materials. The government's unsupported intimations of counsel's role in evil plots is too fanciful to preclude this most reasonable procedure. Habeas counsel with access to classified information are aware that we work under the shadow of possible contempt and criminal sanctions; those of us with access to the legal papers have security clearances; and we are all officers of the Court. As such, we ask the Court to protect our clients' privileges.

## V.    REQUEST FOR ORAL ARGUMENT

Petitioner respectfully requests the Court to hear oral arguments on the foregoing issues.

---

[48]    In re Grand Jury Subpoenas, slip op. at 10.

DSMDB-2117184v01

**CONCLUSION**

For these reasons, the Respondents' motion should be denied and Petitioner's motion

granted.

Dated: Washington, DC
July 21, 2006

Respectfully submitted,

/s/ Reginald B. McKnight
David L. Engelhardt (DC 429886)
Reginald B. McKnight (DC 493946)
Shamir Patel (DC 494444)
DICKSTEIN SHAPIRO LLP
1825 Eye St. NW
Washington, DC 20006
(202) 420-2200 (tel)
(202) 420-2201 (fax)

*Of Counsel*
Barbara Olshansky
Gitanjali S. Gutierrez
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, NY  10012
(212) 614-6464 (tel)
(212) 614-6499 (fax)

20

DSMDB-2117184v01

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2006, I served the foregoing upon the following persons by electronic filing and e-mail.

Terry M. Henry (terry.henry@usdoj.gov)
Preeya M. Noronha (preeya.noronha@usdoj.gov)
Andrew I. Warden (andrew.warden@usdoj.gov)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC 20530
Tel: (202) 514-4107
Fax: (202) 616-8470
*Attorneys for Respondents*

/s/ Shamir Patel
Shamir Patel

21

DSMDB-2117184v01