*PREVIOUSLY FILED WIH CSO AND*
*CLEARED FOR PUBLIC FILING*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ABD AL HAKIM GHALIB AHMAD ALHAG, *et. al.,* | ) ) ) ) | |
| *Petitioners,* | ) ) | Civil Action No. 05-cv-2199 (HHK) |
| *v.* | ) ) ) | |
| GEORGE W. BUSH, *et al.,* *Respondents.* | ) ) ) | |

**PETITIONER'S REPLY IN FURTHER SUPPORT OF HIS MOTION FOR FACTUAL
RETURNS**

Petitioner submits this reply in further support of his Motion for Factual Returns (Doc.

No. 32). Respondents' opposition merely recites arguments that Respondents have relied on in

support of the Detainee Treatment Act of 2005 ("DTA"), and their reliance on the Military

Commissions Act of 2006 ("MCA") is premature, as the constitutionality of the MCA is

currently pending before the United States Court of Appeals for the District of Columbia

Circuit.[1] Moreover, Respondents mischaracterize Petitioner's request to this court as a "merits-

related matter," which it clearly is not. Finally, Respondents fail to show why this Court should

not follow its own practice in routinely providing for factual returns.

---

[1] Petitioner addresses the constitutionality of the MCA to preserve the issue for further
review if necessary. Because the District of Columbia Circuit will decide the constitutionality of
the MCA, it is not necessary to decide the issue here. Indeed, in an Order discussed *infra*, this
Court has stated that the jurisdictional questions here "are legal questions that have not yet been
resolved by the D.C. Circuit and will not be resolved here." *See* Order, *Feghoul v. Bush*, No. 06-
618 (D.D.C. Oct. 31, 2006) (Roberts, J.).

## ARGUMENT

### I.     The Burden On Respondents Would Be Trivial

Respondents argue that certain "logistical burdens" should stop this Court from ordering

factual returns. *See* Respondents' Opposition (Doc. No. 33) ("Opp.") at 5. Respondents provide

no factual support for this contention – no affidavit, no documentary evidence, no testimony –

and the Court should reject it out of hand. In his motion, Petitioner set forth numerous examples

of the short time frames in which Respondents have produced factual returns. For example, in

*Said v. Bush*, Respondents produced *four separate* factual returns within ten days of an order.

*See Said*, No. 05-CV-2384 (D.D.C. May 23, 2006). In *Errachidi v. Bush*, Respondents produced

factual returns within a seven-day time frame, *see Errachidi*, No. 05-CV-640 (D.D.C. Apr. 21,

2005) and did the same in *Abdullah v. Bush*, No. 05-CV-023 (D.D.C. Apr. 8, 2005). As

discussed below, just two weeks ago Respondents produced factual returns within <u>twenty days</u> of

Judge Roberts' Order. *See* Order, *Feghoul v. Bush*, No. 06-618 (D.D.C. Oct. 31, 2006) (Roberts,

J.). Respondents' argument is merely an explanation of the process by which factual returns are

produced, with unsupported claims that the process is time consuming and burdensome.

Additionally, the burdens Respondents recite in their Opposition are the exact same burdens that

this Court has already rejected.[2] *See id.*

Respondents undoubtedly possess documents, and have other evidence, that go directly to

the question of Petitioner's detention. Turning over documents in Respondents' possession

should not be difficult: all such documents are, at most, five years old, all should be in electronic

form or readily searchable. Counsel for Petitioner have security clearances at the appropriate

levels. Indeed, much of the information sought is the sort that Respondents have provided to the

news media. For example, reporters were allowed to witness CSRT proceedings for many

---

[2] Respondents' opposition in *Feghoul* is identical to the opposition submitted in this case.

DSMDB-2178954v02

prisoners. *See* Kathleen T. Rhem, *Reporters Offered Look Inside Combatant Status Review Tribunals*, American Forces Information Service, Aug. 29, 2004 (attached as Exhibit A). For Respondents to now argue that such information should not be provided to counsel is remarkable.

As discussed in Petitioner's opening brief, multiple other judges have ordered the production of factual returns even after the DTA and the MCA.[3] Indeed, on October 31, 2006, just two weeks after the passage of the MCA, this Court ordered Respondents to produce factual returns.[4] *See Feghoul* Order. This order demonstrates that issues concerning the MCA pending before the Court of Appeals have no bearing on an order to produce factual returns.

In its order, the Court noted that the Respondents did not dispute petitioner's basic right "to notice of the factual basis for his detention," but instead disputed the court's jurisdiction, just as Respondents do here. *Id.* Furthermore, the Court stated that it was "hardly sensible to withhold or frustrate something that no one doubts is petitioner's right – meaningful communication with counsel regarding the factual basis of petitioner's detention." *Id.* Petitioner here requests the same relief on the same grounds. This Court should reject Respondents' unsupported contentions and order the production of a factual return within 20 days of its order.

---

[3] *See* Motion For Factual Returns And Memorandum In Support Thereof (Pet. Mem.).

[4] Although Petitioner's motion for the factual returns and the Respondents' opposition were filed prior to enactment of the MCA, Respondents filed a Notice of Filing Military Commissions Act with the Court on October 18, 2006. Presumably, the Court was fully aware of the MCA's jurisdictional and constitutional implications and still granted Petitioner's motion for factual returns.

3

**II.      Neither the Military Commissions Act Nor the Detainee Treatment Act Divests
This Court of Jurisdiction to Order the Production of Factual Returns[5]**

**A.      The Military Commissions Act Does Not Strip This Court of Jurisdiction**

Respondents claim that this Court lacks jurisdiction over Petitioner's habeas petition by

virtue of the MCA.[6] Substituted for this Court's jurisdiction under 28 U.S.C. § 2241 is a new

remedy in the Circuit said to be "exclusive" under the combined effect of the DTA[7] and the

MCA. Respondents' position rests on the efficacy of Section 7 of the MCA, which works the

"jurisdiction-stripping," which in turn depends upon the equivalence of the new Circuit remedy

provided for the *habeas* action eliminated. In short, if the new remedy is *not* the equivalent of

the *habeas* remedy eliminated, the "jurisdiction strip" is void. *See INS v. St. Cyr,* 533 U.S. 289,

305 (2001) (holding that statutory withdrawal of judicial authority to issue a habeas writ without

an "adequate substitute" for such authority raises a "serious Suspension Clause" issue). This

follows from the text of the Constitution and leading Supreme Court cases.

The Suspension Clause, U.S. Const. art. I, § 9, cl. 2,  guarantees that, unless congress

*validly* acts to suspend the writ, the core of the Great Writ at common law, which would issue to

test the legality of Executive detention, must remain available. Since neither preconditions of a

---

[5] This section tracks language from the Petitioner's reply in *Mohammon v. Bush*, No. 05-2386 (D.D.C. Nov. 30, 2006).

[6] This is said to follow from either the DTA or the MCA itself. *See* MCA, Pub. L. No. 109-366, 120 Stat. 2600. As both acts, according to Respondents, purport to remove this Court's jurisdiction and substitute a very limited review of Combatant Status Review Tribunal ("CSRT") determinations in the Circuit on the "record" compiled at Guantánamo, Petitioner treats those acts' effect as the same insofar as this Court's jurisdiction is concerned.

[7] The Statutory provision cited here as the Detainee Treatment Act of 2005 was enacted as title X of the Department of Defense Appropriations Act of 2006, an Act the President signed into law on December 30, 2005. *See* Pub. L. 109-148, §§ 1001-1006, 119 Stat. 2739-44 (2005). Six days later, Congress passed and the President signed into law the National Defense Authorization Act for Fiscal year 2006, title XIV of which contains a nearly identical version of the Detainee Treatment Act. *See* Pub. L. 109-163, §§ 1401-1406, 119 Stat. 3163, 3474-80. References made herein to the Detainee Treatment Act are intended as references to title X of Public Law 109-148.

4

DSMDB-2178954v02

valid suspension – domestic rebellion or invasion – are present here, there can be no valid

suspension and Section 2241 remains intact, assuming, of course, that the *in lieu* Circuit remedy

is not the equivalent of the *habeas* remedy eliminated.  There is, however, a preliminary question

of whether the jurisdiction strip applies to pending cases, the question to which we now turn.

       1.    *The Jurisdictional Strip Provisions of the MCA do No Apply to This*
               *Habeas Petition*

      Under familiar canons of statutory construction, this Court should avoid a construction of

the MCA that presents troubling constitutional questions.  In *Hamdan v. Rumsfeld,* the Supreme

Court faced a similar question regarding the application of the DTA to pending cases.  *See* 126 S.

Ct. 2749 (2006).  Applying "[o]rdinary principles of statutory construction," the Court concluded

that the DTA did not divest the federal courts of jurisdiction over Hamdan's *habeas* challenge.

*Id.* at 2764, 2765-69.  Because the jurisdictional provision of the MCA's Section 7 follows the

same pattern seen in the DTA, those principles of statutory construction lead to the same result

when applied to the MCA.

      Section 7(a) of the MCA adds a new subsection (e) to 28 U.S.C. §224, the relevant

federal *habeas* statute:

> (e)(1) No court, justice, or judge shall have jurisdiction to hear or consider
> an application for a writ of habeas corpus filed by or on behalf of an alien
> detained by the United States who has been determined by the United
> States to have been properly detained as an enemy combatant or is
> awaiting such determination.
>
> (2) Except as provided in paragraphs (2) and (3) of section 1005(e) of the
> Detainee Treatment Act of 2005 (10 U.S.C. 801 note), no court, justice, or
> judge shall have jurisdiction to hear or consider any other action against
> the United States or its agents <u>relating to any aspect of the detention,
> transfer, treatment, trial, or conditions of confinement of any alien who is
> or was detained by the United States</u> and has been determined by the
> United States to have been properly detained as any enemy combatant or
> is awaiting such determination.

MCA § 7(a) (emphasis added); 28 U.S.C. § 2241(e).  Subpart (1) divests courts of jurisdiction

over *habeas* applications filed by aliens determined to be enemy combatants, or awaiting such

DSMDB-2178954v02

determination. Subpart (2) divests courts of jurisdiction, except as preserved in the DTA, over

any other actions "relating to any aspect of the detention, transfer, treatment, trial, or conditions

of confinement of an alien" determined to be an enemy combatant, or awaiting such

determination.

>    Section 7(b) of the MCA provides:
>
>>    (b)  EFFECTIVE DATE. –The amendment made by subsection (a) shall
>>    take effect on the date of the enactment of this Act, and shall apply to all
>>    cases, without exception, pending on or after the date of the enactment of
>>    this Act which <u>relate to any aspect of the detention, transfer, treatment,
>>    trial, or conditions of detention of an alien detained by the United States</u>
>>    since September 11, 1001.

MCA § 7(b) (emphasis added). Thus, Section 7(a) takes effect on the date of enactment (which

was October 17, 2006) and applies to "all cases, without exception, pending on or after the date

of enactment of this Act which relate to any aspect of the detention, transfer, treatment, trial, or

conditions of confinement of an alien detained by the United States since September 11, 2001."

*Id.*

Significantly, however, Section 7(b) does not expressly refer to *habeas* cases pending on

the date of enactment. Instead, the language of Section 7(b) tracks, virtually word for word, the

language used in Section 2241(e)(2) to refer to "other actions" relating to "detention, transfer,

treatment, trial, or conditions of confinement" – specifically actions other than *habeas* actions,

which are addressed in Section 2241(e)(1). In determining that similar jurisdictional provisions

of the DTA did not apply to the case before it because the case was pending on the DTA's

enactment date, the Supreme Court relied on a "negative inference [that] may be drawn from the

exclusion of language from one statutory provision [when that language] is included in other

provisions of the same statute." *Hamdan,* 126 S. Ct. at 2765 (citations omitted). Here, the same

negative inference may be drawn from the absence of any express reference to a pending *habeas*

DSMDB-2178954v02

application in Section 7(b), in contrast to Section 7(b)'s use of exactly the same terms as Section 2241(e)(2) to identify the cases to which it applies. This demonstrates that the pending cases to which the new statute is intended to apply are precisely those described in Section 1141(e)(2), and therefore not *habeas* actions.

In addition, Section 7(b) applies to pending *habeas* cases only if *habeas* actions are included within the category of cases "which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention." But if *habeas* cases are included in that language of Section 7(b), there would have been no reason for Congress to add a new subsection (e)(1) to Section 2241 dealing separately with *habeas* cases – they would have been covered by the language of subsection (e)(2). Thus, construing Section 7(b) to include *habeas* cases renders subsection (e)(1) superfluous, violating the principle that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Hibbs v. Winn,* 542 U.S. 88, 101 (2004) (citation omitted). Subsection (e)(1) is necessary and has independent meaning only if Section 7(b) does not refer to *habeas* cases. But if Section 7(b) does not refer to *habeas* cases, then the jurisdictional strip in (e)(1) does not apply to pending *habeas* cases such as this one. *See Landgraf v. USI Film Prods.,* 511 U.S. 244, 272 (1994) (statutes "will not be construed to have retroactive effect unless their language requires this result") (internal quotes and citations omitted).

The Supreme Court's "longstanding rule requiring a clear statement of congressional intent to repeal *habeas" St. Cyr,* 533 U.S. at 298, also militates strongly against an interpretation of the MCA that strips the Court of jurisdiction over this case. Implications from intentional ambiguity – which all the relevant canons of construction and judicial precedents indicate must be read against finding a repeal of pending habeas cases here. Moreover, as in *St. Cyr,* this clear

7

statement requirement is reinforced by an additional canon of construction, namely, the principle

that "if an otherwise acceptable construction of a statute would raise serious constitutional

problems, and where an alternative interpretation of the statute is fairly possible, [the court is]

obligated to construe the statute to avoid such problems." 533 U.S. at 299-300 (internal quotes

and citation omitted). Here, Respondents' contention that the MCA strips the Court of *habeas*

jurisdiction raises serious constitutional problems, which can easily be avoided by the same rules

of statutory construction the Supreme Court employed in *Hamdan,* 126 S. Ct. at 2765-69. It

follows that the MCA does not, as a textual matter, apply to deprive this Court of *habeas*

jurisdiction as urged by Respondents.

> 2.    *The MCA Is Unconstitutional If It Eliminates Petitioner's Ability to See Habeas*

Even if the language of the MCA was effective to strip this Court of jurisdiction over Mr.

El Falesteny's *habeas* claim, the MCA is unconstitutional and thus cannot form the basis for this

Court to deny Mr. El Falesteny's motion.

> a.    The Habeas Corpus Remedy as of the Adoption of the Constitution

The Founders ensured that the availability of the writ was not dependent upon executive

or legislative grace. *See St. Cyr,* 533 U.S. at 304 n.24 (the Suspension Clause "was intended to

preclude any possibility that the privilege itself would be lost by either the inaction or the action

of Congress") (internal quotes omitted). Thus, the constitutional right to *habeas* relief exists

even in the absence of statutory authorization, and may be suspended only by explicit

congressional action under strictly limited conditions. *See Johnson v. Eisentrager,* 339 U.S. 763,

767-68 (1950) (assuming that, in absence of a statutory right of *habeas,* petitioners could seek

the writ directly under the Constitution to the extent their claims fell within the scope of *habeas*

protected by the Suspension Clause).

DSMDB-2178954v02

*Habeas corpus* has long provided a searching factual and legal inquiry into the basis for a prisoner's detention.[8]  This basic purpose of the writ crystallized in response to the seminal, *Darnel's Case,* 3 How,. St. Tr. 1 (K.B. 1627).  There, the king had indefinitely detained suspected enemies of state based solely upon his "special command," *id.* at 37, and sought to block any inquiry into the factual and legal basis for their confinement.  When the court upheld the Crown, it sparked a constitutional crisis that firmly established *habeas* as the pre-eminent safeguard of common law process and personal liberty with the enactment of the Petition of Right, 3 Car. 1, c.1 (1628); the Habeas Corpus Act of 1641, 16 Car. 1, c.10 (1641); and the Habeas Corpus Act of 1679, 31 Car. 2, c.2 (1679).  By the late 1600s, *habeas* corpus had become, and would remain, "the great and efficacious writ, in all manners of illegal confinement," 3 William Blackstone, Commentaries 131, and the most "effective remedy for executive detention," Dallin H. Oaks, *Legal History in the High Court – Habeas Corpus,* 64 Mich. L. Rev. 451, 460 (1966).

At common law, *habeas* courts did not simply accept the government's return to a prisoner's petition; rather, they often probed the return and examined additional evidence submitted by both sides to ensure the factual and legal sufficiency of the commitment.  *See, e.g., Goldswain's Case,* 96 Eng. Rep. 711, 712 (C.P. 1778) (judges temporarily discharge impressed sailor, refusing to "shut their eyes" to facts in petitioner's affidavits showing he was legally exempt from impressments); *R. v. Delaval,* 97 Eng. Rep. 913, 915 (K.B. 1763) (scrutinizing affidavits and concluding that a girl had been fraudulently indentured as an apprentice and was being misused as a prostitute); *R. v. Turlington,* 97 Eng. Rep. 741, 741 (K.B. 1761) (discharging a woman from "mad-house" after ordering medical inspection, reviewing a doctor's affidavit, and inspecting women who "appeared to be absolutely free from the least appearance of

---

[8] Petitioner lays out the history of the writ as it existed in 1789 and was known to the framers of the Constitution.

9

insanity"); *Eleanor Archer's Case* 1701, Lincoln's Inn, MS Misc. 713, p.164 (K.B. 1701) (Holt, C.J.) ("court upon oath examined [woman]" to assess claim of mistreatment by her father); *Barney's Case,* 87 Eng. Rep. 683 (K.B. 1701) (allowing bail after affidavits proved malicious prosecution); *R. v. Lee,* 83 Eng. Rep. 482, 482 (K.B. 1676) (reviewing affidavits to adjudicate a wife's assertion of "ill usage, imprisonment and danger of her life" by her husband); *see also Goldswain's Case,* 97 Eng. Rep. at 712 (Gould, J.) ("I do not conceive, that either the Court of the party are concluded by the return of a *habeas corpus,* but may plead to it any special matter necessary to regain his liberty"); *Bushell's Case,* 124 Eng. Rep. 1006, 1010 (C.P. 1670) (Vaughan, C. J.) (deeming a return insufficient because it lacked "full and manifest" evidence necessary to sustain commitment); *see generally, e.g.* R.J. Sharpe, *The Law of Habeas Corpus* 66-68 (1989) (citing *habeas* cases involving factual inquiries); *Oaks, supra,* at 454 n.20 (observing that the instances where *habeas* courts conducted fact-finding in non-criminal cases are "sufficiently comprehensive to include most...cases").

Indeed, alleged enemy aliens could also challenge the factual basis of their commitment on *habeas* to ensure that the commitment was within the bounds prescribed by law. *Three Spanish Sailors' Case,* 96 Eng. Rep. 775 (C.P. 1779) (examining affidavit detailing facts supporting petitioners' release, but concluding that, "upon their own showing," they are alien enemies); *accord R. v. Schiever,* 97 Eng. Rep. 551 (K.B. 1759).

Further, *habeas* courts exercised broad equitable powers to fashion remedies as the circumstances required. *See, e.g., Earl of Aylesbury's Case,* Harv. L. Sch. MS 1071, fol. 52 (K.B. 1696) (bailing prisoner suspected of treason because it was "just and reasonable" to do so, and "within [the court's] power by the common law").[9]

_____

[9] The occasional general statement that at common law the petitioner could not controvert the truth of a return to a *habeas* petition must be read in the specific context in which it was made: criminal cases. Rollin C. Hurd. *A Treatise on the Right of Personal liberty, and on the Write of Habeas Corpus,* 270-71 (1876) (hereinafter *"Hurd"*).  The reason is simple: in criminal

DSMDB-2178954v02

The very essence of *habeas* – its substance – was a searching inquiry by neutral judges into the factual and legal validity of the jailer's proffered justification for the detention. And, to the extent that the lawfulness of the detention turned upon disputed issues of fact, the courts conducted adversary hearings in which the parties presented evidence from courtroom examination. It was these broad equitable features, not the technicalities of pleading, that made the Great Write of Liberty great.

b.    The Writ as Developed In the United States

The Supreme Court has described *habeas corpus* as "a writ antecedent to statute, …throwing its roots deep into the genius of our common law." *Rasul v. Bush,* 542 U.S. 466, 473 (2004) (internal quotations marks omitted; alterations in original). "It was brought to America by the colonists, and claimed as among the immemorial rights descended to them from their ancestors … this great writ found prominent sanction in the Constitution." *Ex parte Yerger,* 75 U.S. (8 Wall.) 85, 95 (1869).

The negative phraseology of the Suspension Clause itself reflects the Framers' understanding that the privilege of the writ of *habeas corpus* is not something for Congress to give. The Suspension Clause provides that "[t]he Privilege of the Writ of habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion, the public safety may require it." U.S. Const. art. I, § 9, cl.2. The exercise of this authority to suspend the Great Writ is justly

---

cases, the prisoner either had already been convicted at a trial that provided full common law process, including the opportunity to confront and cross-examine any witnesses against him, *Crawford v. Washington,* 541 U.S. 36, 49 (2004), or was confined pending such trial, in which case *habeas* guaranteed that he would receive that process without delay. *Habeas Corpus* Act of 1679, 31 Car. 2, c.2, § 7 (1679) (securing right to speedy trial); *see also Hurd* at 266 ("It was the hateful oppressiveness of long and close confinement, and not the dread of a trial by his peers, which made the suffering prisoner of sate exclaim: 'The write of *habeas corpus* is the water of life to revive from the death of imprisonment'") (emphasis omitted). By contrast, in non-cirminal cases, including and especially cases of executive detntion without trial, the *habeas* court itself supplied common law process by undertaking a factual inquiry into the basis of detention in the first instance.

DSMDB-2178954v02

hailed as the "highest safeguard of liberty." *Smith v. Bennett,* 365 U.S. 708, 712 (1961), and is a momentous step. The Supreme Court has reiterated its hesitation to conclude that Congress has exercised its authority to suspend the Great Writ. *See St. Cyr,* 533 U.S. at 305 ("[A] serious Suspension Clause issue would be presented if we were to accept the INS's submission that the 1996 statutes have withdrawn that power from federal judges and provided no adequate substitute for its exercise."); *Ex parte Bollman,* 8 U.S. (4 Cranch) 75, 101 (1807) ("[u]til the legislative will [to suspend the writ] be expressed, this court can only see its duty" to issue the writ). Congress, too, has historically been extremely sparing in its exercise of the suspension power, acting to suspend the writ on only four prior occasions, when the country was facing actual or imminent hostilities on its territory. *See* Thomas C. O'Bryant, *The Great Unobtainable Writ: Indigent Pro Se Litigation After the Antiterrorism and Effective Death Penalty Act of 1996,* 41 Harv. C.R.-C.L.L. Rev. 299, 302 n.18 (Summer 2006); *see also Hamdi v. Rumsfeld,* 542 U.S. 507, 562-63 (2004).

Assuming *arguendo,* however, Congress' intent to eliminate the writ for prisoners at Guantánamo is clear, the validity of the Suspension must be directly faced. Thus we now examine if the alternative provided by Congress *in lieu* of *habeas* is the equivalent of *habeas.* Although today the writ is most frequently employed as a post-conviction collateral remedy for an unlawful criminal conviction, its "historical core" served "as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *Rasul,* 542 U.S. at 474 (quoting *St. Cyr,* 533 U.S. at 301); *Swain v. Presley,* 430 U.S. 372, 386 (1977) (Burger, C.J., concurring) ("[T]he traditional Great Writ was largely a remedy against executive detention."). From its earliest *habeas corpus* cases, the Supreme Court has made clear that the writ should issue for the benefit of a petitioner who challenges the Executive's authority to bring him to trial, even before a final conviction at such a trial. Thus, in *Bollman* and *Ex parte*

12

*Burford,* 7 U.S. ( Cranch) 448 (1806), the Court issued the writ for the benefit of prisoners who contended that the government had an inadequate basis to detain them for criminal proceedings. *See also United States v. Hamilton,* 3 U.S. (3 Dall.) 17 (1795). Similarly, in *United States v. Villato,* 2 U.S. (2 Dall.) 370 (C.C.D. Pa. 1797), the defendant, committed by the district judge on a charge of high treason, persuaded the court that he had never been validly naturalized and therefore could not be prosecuted for treason for acts committed abroad.

These decisions were reaffirmed after the Civil War. In *Ex parte Yerger,* the Supreme Court held that it had jurisdiction to issue the writ to determine whether Yerger's impending trial by a military commission was lawful. *See Yerger,* 75 U.S. (8 Wall.) at 106; *see also id.* at 101- 02 (noting that the writ extends to cases in which a petitioner was awaiting trial before a court of the United States). The Court expressed no doubt that, if Yerger had (as he claimed) a right not to be tried by the military commission, he was entitled to release from the custody of the commission. The petitioner in *Ex parte McCardle,* 74 U.S. (7 Wall.) 506 (1868), was in the same position; he brought a pre-conviction *habeas* petition challenging the constitutionality of his military detention. Although the Court ultimately ruled in *McCardle* that it lacked jurist diction over the petitioner' appeal from the circuit court's decision to remand him to military custody, the Court expressed no doubt that the circuit court could have issued a writ to prevent the petitioner's trail by a military commission, had the petitioner established a right not be so tried. *See id.* at 515.

These decisions also establish that, when a *habeas* petitioner challenges the authority of jurisdiction of the body that lays claim to try or detain him, the petitioner is entitled to be heard on the merits of that challenge even before any contemplated trial is completed. Here, Petitioner contends, in essence, that he has a right not to be classified by the combatant Status Review Tribunal ("CSRT'") process (challenged as violating due process) that the military authorities,

13

acting under the direction of the President, have convened. In addition, he seeks a hearing on whether his detention is lawful. If the writ were completely unavailable to challenge this procedure, the right not to be classified by an entity with no authority over the petitioner would become a nullity.

In assessing the suspension question, the view of Kenneth Starr, former Solicitor General, Circuit Court judge, and Independent Counsel, is of more than passing interest. Mr. Starr neither had reason to mince words nor act for any particular interest. He is also qualified to opine. In the debates on the MCA, Mr. Starr wrote a one-page letter to Senator Specter succinctly establishing the invalidity of the jurisdiction-stripping provision that Respondents rely on here. Letter from Kenneth Star to Sen. Arlen Specter, Chairman, Senate Judiciary Committee (Sept. 24, 2006) (attached as Exhibit 2). Mr. Starr concluded with respect to Guantánamo prisoners, citing Article I, Section 9, clause 2, that "[t]he United States is neither in a state of rebellion nor invasion. Consequently it would [be] problematic for Congress to modify the constitutionally protected writ of *habeas corpus* under current events." *Id.*

The opposing view seems to have been based on the idea that prisoners at Guantánamo have no constitutional rights so that their *habeas* rights *cannot* be suspended, as they have none. Mr. Starr addressed this point in observing that as to Guantánamo, *Rasul,* not *Eisentrager,* was good law. *Id.* There are, Mr. Petitioner submits, five Supreme Court votes *for* the proposition that Guantánamo is within the jurisdiction of the United States for constitutional purposes, not just statutory analysis. It follows that Petitioner has constitutional rights and the suspension question cannot be brushed aside as Respondents urge.

c.    The *In Lieu* Circuit Remedy Is Not the Equivalent of the Writ

If the jurisdiction-stripping provisions of the DTA and MTA are bad, it will be because the circuit remedy *in lieu* of *habeas* is not its equivalent. As a corollary, this means that

DSMDB-2178954v02

whatever role the Circuit may have, it does not affect this Court's power to act under Section 2241. But is the *in lieu* Circuit remedy the equivalent to *habeas*? To that question we now turn. We first sketch the *in lieu* rights before the Circuit court and then compare them to *habeas*.

Under the DTA and MCA, a prisoner's entitlement to judicial review of the legality of his detention is entirely predicated on the government's decision to institute proceedings against him, either in the form of a CSRT or a military commission. *See* DTA § 1005(e)(2); MCA § 7(a). If the government simply does nothing, the detainee has no means of challenging the legality of his detention. Naturally, this provides an incentive for the government to delay, or not institute proceedings at all, which would effectively deprive detainees of any judicial forum. This is simple despotism.

Further, as Judge Green has already found, the CSRT procedures are deficient in at least three respects. *In Re Guantánamo Detainee Cases,* 355 F. Supp. 2d 443 (D.D.C. 2005). First, Judge Green noted the general defect in all CSRT proceedings, namely the failure to provide detainees access to material evidence on which their "enemy combatant" status was affirmed and the failure to permit assistance of counsel. *Id.* at 468-72. Next, she identified reliance on statements obtained by torture or other coercive measures as a grotesque shortcoming of the CSRT procedures. *Id.* at 472-74. Finally, she observed the overly broad definition of "enemy combatant" was problematic. *Id.* at 474-77. Each of these defects in the CSRT proceedings affect Petitioner here, and Judge Green found each to be of constitutional significance. *See id.* at 468-78. We do not repeat her findings in detail but suffice it to say those findings indicate the CSRT proceedings deviated markedly from a fair fact-finding procedure such as the one *habeas* entails, and the review provided by the DTA in the Circuit will not allow challenges to the composition and functioning of the CSRTs themselves.

DSMDB-2178954v02

Thus none of the infirmities that Judge Green identified can be pressed before the Circuit. Rather, that review is limited to:

> (i) whether the status determination of the Combatant Status Review Tribunal with regard to such alien was consistent with the standards and procedures specified by the Secretary of Defense for Combatant Status Review tribunals (including the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence and allowing a rebuttable presumption in favor of the Government's evidence)…

DTA § 1005(e)(2)(c)(i).

This amounts to saying that review is limited to determining if the CSRT has followed its own deeply flawed playbook. Even if the government promptly conducts a CSRT to make a status determination, the DTA does not permit the Circuit Court to engage in the sort of factual inquiry that has long been available via *habeas*. Section 1005(e)(2) does not allow petitioners to engage in discovery (including discovery into whether evidence against them was obtained by coercion), "traverse" the return, or obtain a hearing, as provided by 28 U.S.C. §§ 2243-2248.

Thus in no sense is the Circuit remedy provided *in lieu* of *habeas* the equivalent of *habeas*. This Court should find that it has jurisdiction over Petitioner's *habeas* claim and jurisdiction to require production of a factual return.

**III.    An Order Granting Petitioner's Motion for Factual Returns is Not a Decision on the Merits**

Respondents mischaracterize Petitioner's motion for factual returns as a "merits-related" proceeding. *See* Opp. at 4. On the contrary, Petitioner is not asking this Court to decide the legality of his detention. Rather, Petitioner merely requests access to factual findings that are relevant to a challenge to his detention. As noted above, it is Petitioner's fundamental right "to notice of the factual basis for his detention." *Feghoul* Order.

The Court should also reject Respondents' refusal to produce Administrative Review Board ("ARB") transcripts based on Respondents' contention that an ARB proceeding is not

16

justiciable.  Respondents again incorrectly state that production of ARB transcripts is equivalent to a review of the merits of the ARB's determination and argue that ARB proceedings are unrelated to habeas petitions.  *See* Opp. at 6-7.  Respondents define CSRT proceedings as "annual assessments . . . of whether a detainee is being properly detained as an enemy combatant," whereas ARB proceedings determine "whether it is in the interests of the United States to transfer or continue to detain an individual who has already been determined to be an enemy combatant in CRST proceedings."  Opp. at 6.

This is a distinction without a difference.  While it may be true that an "ARB determination involves a complex weighing of factors and exercise of discretion by the Military that is not justiciable," this misses the point.  Opp. at 7.  For purposes of this motion, Petitioner does not challenge the determination made in the ARB proceeding.  Petitioner simply requests notice of the factual basis for his detention, and ARB transcripts are an equally important source of such information, which is crucial to Counsel's representation of Petitioner.  Accordingly, this Court should order Respondents to produce factual returns related to Petitioner's detention.

**CONCLUSION**

For the foregoing reasons, the Court should grant Petitioner's Motion for Factual Returns.


Dated: December 7, 2006                    Respectfully submitted,


                                           /s/ Reginald B. McKnight____
                                           Frank C. Razzano (DC360173)
                                           David L. Engelhardt (DC429886)
                                           Johnisha Matthews (DC492478)
                                           Reginald B. McKnight (DC493946)
                                           Lisa M. Kaas (DC492302)
                                           John C. Snodgrass (DC473864)
                                           DICKSTEIN SHAPIRO LLP
                                           1825 Eye Street NW
                                           Washington, DC  20006
                                           Telephone:  (202) 420-2200

DSMDB-2178954v02

Fax: (202) 420-2201

*Of Counsel*
Barbara J. Olshansky (NY0057)
Director Counsel
Tina Monshipour Foster (NY5556)
Gitanjali S. Gutierrez (NY1234)
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6439
Fax: (212) 614-6499

DSMDB-2178954v02

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served

on the following counsel for Respondents:

       Terry M. Henry
       U.S. Department of Justice
       Civil Division, Federal Programs Branch
       20 Massachusetts Ave., NW, Room 6120
       Washington, DC 20530

       and

       Andrew I. Warden
       U.S. Department of Justice
       Civil Division, Federal Programs Branch
       20 Massachusetts Ave., NW, Room 6120
       Washington, DC 20530

On this the 7th day of December, 2006.

                                 /s/ Reginald B. McKnight
                                 Reginald B. McKnight

DSMDB-2178954v02